**NINTENDO OF AMERICA, INC.,**
Plaintiff–Appellant,

v.

**LEWIS GALOOB TOYS, INC.,**
Defendant–Appellee.

No. 92–16364.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 14, 1993.

Decided Feb. 17, 1994.

John J. Kirby, Jr., Mudge, Rose, Guthrie, Alexander & Ferdon, New York, New York; and William E. Trautman, Brobeck, Phleger & Harrison, San Francisco, California, for the plaintiff-appellant.

Martin R. Glick, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, California, for the defendant-appellee.

Before: LAY *, HALL and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Nintendo of America, Inc. appeals the execution of a $15 million bond in favor of Lewis Galoob Toys, Inc. Nintendo posted the bond as security for a preliminary injunction against Galoob in a copyright infringement action Nintendo later lost. The district court awarded Galoob the entire amount of the bond after finding the injunction caused Galoob at least $15 million in damages.

Nintendo argues the district court erred in three ways: First, by not weighing equitable considerations before deciding to execute the bond; second, by improperly finding the injunction harmed Galoob; and third, by improperly calculating the amount of Galoob's damages.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## FACTS

The Nintendo Entertainment System ("NES") was the most popular home video game system in the United States from the late 1980s until the early 1990s. Its manufacturer, Nintendo of America, Inc., began selling the NES in 1986. By 1991 Nintendo had sold over thirty million units in the United States.

Several years after Nintendo introduced the NES, Lewis Galoob Toys, Inc. announced its intention to begin selling the Game Genie, an electronic device allowing NES owners to change aspects of NES video games. For example, the Game Genie would permit a video game character to run faster, jump higher, or become immortal.

At the time of Galoob's announcement of the Game Genie, in May 1990, NES product sales were at or near their peak. Nintendo sold nearly fifteen million NES video games that year, exceeding any other year's sales.

* Hon. Donald P. Lay, Senior Circuit Judge for the   Eighth Circuit, sitting by designation.

Consumer interest in the Game Genie was similarly intense. Immediately after the product announcement, Galoob received orders for over 550,000 Game Genies, and expected to sell well over a million units in 1990. Expert witnesses later testified Galoob could have sold as many as 6.5 million units over the product's lifetime.

Only one month after Galoob's announcement, however, Nintendo obtained a preliminary injunction against the sale of the Game Genie. Nintendo's lawsuit and request for a preliminary injunction responded to an earlier lawsuit filed by Galoob in which Galoob sought a declaratory judgment that its Game Genie did not violate any of Nintendo's intellectual property rights.

At the hearing for the preliminary injunction, Galoob asserted that the Game Genie fell under an exception to rights provided to a copyright owner by the Copyright Act. Specifically, Galoob contended that the Game Genie allowed an "adaptation ... created as an essential step in the utilization of [a] computer program," which 17 U.S.C. § 117 states is a permissible use of a copyrighted work. The district court granted the injunction, believing at the time it was likely "Nintendo will prevail on its claims that Galoob [has infringed] Nintendo's copyright rights; [and] that Nintendo will suffer immediate and irreparable harm as well as the loss of profits."[1] The district court required Nintendo to post a $100,000 bond as security for the injunction. This amount was later raised to $5 million and then to $15 million. Nintendo resisted these increases, but nevertheless posted bond in the increased amounts.

At the copyright infringement trial, Galoob asserted additional legal theories it had not asserted at the preliminary injunction hearing. It contended that the Game Genie was a fair use of Nintendo's copyrights under 17 U.S.C. § 107 and that the game did not create infringing derivative works. Galoob prevailed at trial and in July 1991 the district court vacated the injunction.[2] The injunction had been in effect approximately one year.

In August 1991, Galoob began selling the Game Genie. It sold about one million units in the United States that year and expected to sell as many as 800,000 in 1992. In September 1991, the district court ordered the execution of the bond in favor of Galoob "in an amount to be determined by the Court."

In December 1991, the court held a "lost sales" hearing to determine the number of Game Genie sales Galoob lost because of the injunction. To establish the number of lost sales, Galoob presented evidence comparing the Game Genie to another NES accessory called the "Nintendo Advantage." The Advantage is a joystick, manufactured and sold by Nintendo. The Advantage permits NES owners to more easily control the characters in video games. The Advantage reached a "market penetration" of ten percent, meaning one Advantage was sold in the United States for every ten NESs. Galoob also presented studies explaining the "Canadian multiplier method," which showed that, in general, a product will sell ten to twelve times as well in the United States as in Canada. Galoob estimated it would sell 190,000 Game Genies in Canada by the end of 1991.

In response to Galoob's assertion of lost sales, Nintendo argued that annual NES sales did not provide a reliable indicator of Game Genie demand. Although annual sales of the NES declined in 1991, the "installed base," or number of NES systems owned in the United States, increased. By the end of 1990, there were 26 million NES systems in the United States, and by the end of 1991, there would probably have been more than 30 million. One of Galoob's marketing documents showed that 93 percent of all NES consoles ever sold were still in use at the end of 1991. On the basis of this evidence, Nintendo contended there was actually an increase in the number of potential Game Ge-

---

1. We affirmed the district court's order granting the preliminary injunction in an unpublished memorandum disposition filed January 24, 1991. See Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc., 923 F.2d 862 (9th Cir.1991) (unpublished disposition).

2. We affirmed the judgment in May 1992. Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc., 964 F.2d 965 (9th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993).

nie customers since the district court imposed the injunction.

The district court determined Galoob lost at least 1.6 million Game Genie sales. In arriving at this number, the district court assumed the Game Genie was at least as attractive to NES owners as was the Nintendo Advantage. Because the NES's installed base was 30 million at the end of 1991, and the Advantage's market penetration was ten percent, Galoob should have sold at least three million Game Genies, or ten percent of 30 million, over the product's lifetime had the court not issued the injunction. To check the accuracy of this estimate, the court applied the Canadian multiplier method, using the estimated total Canadian Game Genie sales of 190,000 and a multiplier of eleven. The resulting 2,090,000 was, in the court's view, "very close to 3 million," and satisfied the court its estimating method was reasonable.

Noting testimony that four million more NES units would be sold in 1992, the district court then added another ten percent, or 400,000 units, to the figure of three million and concluded Galoob would have sold 3.4 million Game Genies over the product's lifetime. The court subtracted the one million Game Genies Galoob actually sold in 1991 and the estimated 800,000 it would sell in 1992. The court concluded Galoob lost 1.6 million Game Genie sales due to the injunction.

This conclusion was based on estimates the court determined were reasonable. The court stated: "I think that these calculations are conservative. I have tried in estimating to take basically the bottom end of everybody's range, and if you want to tell me why that isn't fair, I'm certainly willing to listen."

The district court also held a "profits hearing." At this hearing Galoob established that the average net wholesale price for the Game Genie was $34.28. Nintendo does not contest this figure, but does contest the district court's finding that Galoob's net profit margin was 27.6 percent. The district court applied this percentage to the average net wholesale price to determine Galoob's net profit on each Game Genie (27.6% × $34.28 = $9.46).

To establish its net profit margin percentage, Galoob called an economist. He testified that Galoob's profit margin was 42.74 percent. In arriving at this figure, the economist deducted variable costs allocable to Game Genie sales, but not fixed costs which he described as costs that would have been incurred regardless of Game Genie sales.

Nintendo contested the economist's determination of Galoob's profit margin percentage by challenging his categorization of variable and fixed costs. Nintendo presented an accountant who examined financial data for the Galoob company as a whole and concluded an extra 18.77 percent should be deducted from Galoob's economist's figure of 42.74 percent.

In determining that Galoob's profit margin was 27.6 percent, the court began with the testimony of Galoob's economist that Galoob's profit margin was 42.74 percent. The court stated the economist's method in calculating this figure was a "rational and reliable one." The court agreed with Nintendo's contention, however, that four categories of Galoob's costs, namely, salaries and benefits, travel and entertainment, promotion, and interest, had to be taken into consideration in arriving at the profit margin. It disagreed with Nintendo's contention that as much as 18.77 percent should be deducted from the economist's profit margin figure, but nevertheless lowered the profit margin to 32.74 percent.

Nintendo also disputed the proper allocation of other costs, such as "reworking the Game Genie, tooling, packaging, TV origination, and contract R & D." The court included these factors in its calculations, "[a]ssuming, without deciding, that Nintendo is correct in each of these contentions," and further reduced the profit margin from 32.74 percent to the final figure of 27.6 percent.

By multiplying the 1.6 million unit sales lost by the net wholesale price of $34.28, times the 27.6 percent profit margin, the district court found Galoob suffered at least $15,138,048 in lost profits due to the injunction. The court also calculated Galoob lost $315,569 in interest it would have earned on its lost profits and $480,000 in costs it incurred "when [Galoob] ceased production and

distribution and thereafter recommenced those activities upon dissolution of the injunction." Because the total of these amounts exceeded the $15 million bond Nintendo posted, the district court awarded Galoob the entire amount of the bond, plus costs, under Federal Rule of Civil Procedure 65.1. This appeal followed.

## STANDARD OF REVIEW

We review de novo a district court's decision to execute a bond. *Matek v. Murat*, 862 F.2d 720, 733 (9th Cir.1988) (noting the conflict between "abuse of discretion" and "de novo" standards of review among circuits but choosing the latter). An allegation that a district court ignored legal procedure raises a question of law we also review de novo. *Anderson v. United States*, 966 F.2d 487, 489 (9th Cir.1992). A district court's computation of damages is a finding we review under the clearly erroneous standard. *Stephens v. City of Vista*, 994 F.2d 650, 655 (9th Cir. 1993); *Lum v. Honolulu*, 963 F.2d 1167, 1170 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 659, 121 L.Ed.2d 585 (1992); *Galindo v. Stoody Co.*, 793 F.2d 1502, 1516 (9th Cir. 1986).

## DISCUSSION

The first issue we consider is whether Galoob was wrongfully enjoined. We conclude it was. We then consider what standard we should apply to ascertain whether the district court erred in determining that Galoob was entitled to damages. Finally, we consider whether the district court erred in computing the amount of damages.

Rule 65(c) of the Federal Rules of Civil Procedure provides:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c).

Under this rule, before a court may execute a bond, it must find the enjoined or restrained party was "wrongfully enjoined or restrained."[3] This circuit has yet to define wrongful enjoinment. We hold today that a party has been wrongfully enjoined within the meaning of Rule 65(c) when it turns out the party enjoined had the right all along to do what it was enjoined from doing.[4] *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir. 1990) ("A party has been 'wrongfully enjoined' under Fed.R.Civ.P. 65(c) if it is ultimately found that the enjoined party had at all times the right to do the enjoined act.").

Here, Nintendo obtained a preliminary injunction enjoining Galoob from selling the Game Genie. As it turned out, Galoob prevailed in the underlying litigation. The district court held Galoob could sell the Game Genie and vacated the preliminary injunction. We affirmed on appeal. *Galoob Toys*, 964 F.2d 965. Thus, Galoob was wrongfully enjoined.

This brings us to the next question: Is Galoob entitled to have the bond executed in its favor? Although there seems to be some variance in how other circuits respond to this question, we join what appears to be the majority and hold there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the bond executed and recover provable damages up to the amount of the bond. *See, e.g., National Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C.Cir.1992) (a "defendant injured by a wrongfully issued preliminary injunction is

---

**3.** Because this case involves a preliminary injunction rather than a temporary restraining order, we use the term "wrongfully enjoined" rather than "wrongfully restrained."

**4.** We prefer the wording of Rule 65(c), which speaks in terms of a party who has been "wrongfully enjoined," rather than the wording in some cases in other circuits which refers to an injunc-

tion as having been "wrongfully issued." Fed.R.Civ.P. 65(c). A court that complies with the applicable law in issuing a preliminary injunction does not "wrongfully" issue it. Indeed, in an earlier appeal in this case we upheld the district court's issuance of the preliminary injunction. *See Nintendo*, 923 F.2d 862 (unpublished disposition).

presumptively entitled to recovery on the injunction bond"), *cert. denied,* —— U.S. ——, 113 S.Ct. 966, 122 L.Ed.2d 122 (1993).

We believe this rule is sound. By adhering to this standard, the party enjoined will usually recover damages, thus discouraging parties from requesting injunctions based on tenuous legal grounds. *See Coyne–Delaney Co. v. Capital Dev. Bd.,* 717 F.2d 385, 392 (7th Cir.1983) ("... [this test] discourages the seeking of preliminary injunctions on flimsy (though not necessarily frivolous) grounds."). Furthermore, a presumption that damages will be awarded from the bond assures district court judges that defendants will receive compensation for their damages in cases where it is later determined a party was wrongfully enjoined. *See* Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c),* 99 Harv.L.Rev. 828, 838 n. 36 (1986). Moreover, demands on judicial resources may be relieved to some extent, because a defendant who can recover damages against a preliminary injunction bond will be less likely to file a separate malicious prosecution action. *See generally* Note, *Interlocutory Injunctions and the Injunction Bond,* 73 Harv.L.Rev. 333 (1959). Finally, this standard provides an equitable means by which courts can decline to impose damages on the rare party who has lost a case on the merits but nevertheless should not suffer the execution of the preliminary injunction bond.

■ Nintendo argues it rebutted this presumption. Nintendo points out it acted in good faith in bringing its copyright infringement lawsuit, Galoob failed to assert defenses to the preliminary injunction it could have asserted at the preliminary injunction hearing, public policy favors the issuance of injunctions in intellectual property infringement suits, and to award Galoob $15 million imposes a punitive sanction against Nintendo. We consider each of these arguments in turn.

We reject Nintendo's good faith argument. Good faith in the maintenance of litigation is the standard expected of all litigants. That a party lives up to this standard simply means the party did what it ought to have done. On the other hand, if a party obtains a preliminary injunction in bad faith, that party "flunks [the good faith test and] the presumption in favor of enforcement [of the bond] congeals virtually into a rock." *National Kidney,* 958 F.2d at 1135.

Nintendo's argument that Galoob failed to assert all of its defenses at the time Nintendo sought the preliminary injunction raises the scepter of bad faith on the part of Galoob. The essence of this argument is that Galoob took advantage of Nintendo by initially making its case appear to be worse than it really was, thus lulling Nintendo into obtaining the preliminary injunction. The implication of the argument is that Galoob cunningly got the court to raise the amount of the bond on two successive occasions, finally pushing it up to $15 million, while concealing the hole cards it intended to play at the time of trial. Nintendo argues it would be inequitable to permit Galoob to recover damages when it pursued such wily litigation tactics. In support of this argument, Nintendo relies on *Page Communications Eng'rs, Inc. v. Froehlke,* 475 F.2d 994 (D.C.Cir.1973).

*Page Communications* is inapposite. There, the court declined to award damages to an enjoined defendant in a contract action. The defendant earlier agreed to produce "all 'records relating to the evaluation of proposals submitted' by the various offerors, and all 'documents setting forth the basis for award.'" *Page Communications,* 475 F.2d at 996. Although this language described a particular report the defendant possessed, the defendant intentionally declined to produce the report. In granting the injunction for the plaintiff, the district court believed erroneously it had examined all the relevant evidence. Because the defendant was responsible for the missing evidence, and because the district court would probably not have granted the injunction had it seen the report, the court concluded that in light of these circumstances, it would be inequitable to assess damages against the plaintiff. *Id.* at 997.

Here, Galoob did not fail to produce evidence. It did not deceive the court. There is no indication in the record that Galoob sandbagged Nintendo into prevailing on its application for the preliminary injunction, knowing all the while that it could have de-

feated that application. Those facts simply are not in this case. All that appears is that Galoob had additional defenses it asserted at the time of trial, defenses it had not asserted at the preliminary injunction hearing. And while it is true Galoob persuaded the court on two successive occasions to increase the amount of the bond, thus raising the stakes of the game, it is also true that Nintendo called these raises by putting up additional amounts of the bond. We conclude Galoob's litigation conduct does not preclude it from recovering on the bond.

■ Nintendo's public policy argument is premised on its assertion that public policy favors the issuance of injunctions in intellectual property infringement lawsuits. This assertion is correct only when a *permanent* injunction is sought once infringement has been established. *See, e.g., Universal City Studios, Inc. v. Sony Corp. of Am.,* 659 F.2d 963, 976 (9th Cir.1981) ("We note that, as a general rule, a copyright plaintiff is entitled to a *permanent* injunction *when liability has been established* and there is a threat of continuing violations.") (emphasis added), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Public policy does not advocate the liberal issuance of *preliminary* injunctions in copyright infringement actions.

■ We reject Nintendo's argument that the district court awarded punitive damages by executing the bond in favor of Galoob. The damage award was not punitive, but compensatory. Every dollar the court awarded to Galoob compensated it for the injury it had suffered because of the injunction. *Cf. Coyne–Delaney,* 717 F.2d at 392.

■ We next consider whether the district court erred in determining that Galoob suffered at least $15 million in damages by reason of the issuance of the injunction. Nintendo argues the court failed to require Galoob to meet any burden of proof in establishing its damages. The record belies this contention. In its order directing entry of partial judgment, the district court stated, "Galoob has proved by a preponderance of the evidence that it sustained actual injury as a result of the wrongful issuance of the pre-liminary injunction." The court explicitly named the standard it applied to Galoob and explicitly stated Galoob met that burden.

Nintendo challenges this finding. It argues Galoob failed to prove with reasonable certainty that it suffered any damage. *See Palmer v. Connecticut Ry. & Lighting Co.,* 311 U.S. 544, 561, 61 S.Ct. 379, 385, 85 L.Ed. 336 (1941) ("Certainty in the fact of damage is essential."). According to Nintendo, Galoob was not damaged by the injunction because the injunction only delayed Game Genie sales, it did not prevent them permanently. That is, although NES owners who wanted to purchase the Game Genie in 1990 could not do so because of the injunction, they most likely waited a year until the injunction was lifted, and then bought the product anyway.

We reject this argument. It is premised largely on speculation, and as the district court stated, it "defies common sense." Galoob established with reasonable certainty that it was damaged by the issuance of the injunction.

The next question is: Did the district court err in computing the amount of damages Galoob suffered? "The district court's computation of damages ... is ... insulated from review unless clearly erroneous." *Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Serv., Inc.,* 736 F.2d 516, 520 n. 2 (1984); *see also Lum,* 963 F.2d at 1170 (upholding damage award where the award was "not extreme or outrageous").

Throughout its calculation of damages, the district court chose figures favoring Nintendo. The court assumed the Game Genie would sell only as well as the Nintendo Advantage, even though the Advantage was, in its opinion, "not as versatile or long-lasting a peripheral" as the Game Genie. When the court checked the accuracy of its estimate of lost sales, using the Canadian multiplier method, it chose a figure of 190,000 Canadian sales, which was "at the conservative end of the level," and used a multiplier of eleven, which was far below the multiplier of thirty-eight that the Advantage enjoyed. The court also adopted Galoob's highest estimate of its anticipated 1992 sales. It then deducted this

high-end estimate, together with Galoob's actual 1991 sales, from the total sales it determined Galoob would have made "but for" the issuance of the injunction.

In sum, in determining the number of lost sales, the district court repeatedly used the most conservative ends of available ranges. While it is true that Galoob did not likely lose *exactly* 1.6 million sales of the Game Genie, it is reasonably certain it lost at least that amount. The district court's method of calculating the number of lost sales was not erroneous.

With regard to the court's finding that Galoob's profit margin for the Game Genie was 27.6 percent, the court began with the "rational and reliable" estimate of Galoob's economist that the profit margin was 42.74 percent, considered the evidence and contentions of the parties and reduced that figure to 27.6 percent. It did not clearly err in making this finding.

### CONCLUSION

Galoob was wrongfully enjoined from selling the Game Genie. As a result, it was presumptively entitled to recover damages. Nintendo did not rebut this presumption. Galoob proved with reasonable certainty it was damaged by the injunction. The district court did not err in finding Galoob's damages exceeded the $15 million amount of the bond. Galoob was entitled to have the full amount of the bond executed in its favor.

AFFIRMED.