# United States Court of Appeals
## For the First Circuit

Nos. 06-2095, 06-2120

GLOBAL NAPS, INC.,

Plaintiff, Appellant,

v.

VERIZON NEW ENGLAND, INC. d/b/a VERIZON MASSACHUSETTS;
MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY; PAUL
B. VASINGTON, in his capacity as Commissioner; JAMES CONNELLY, in
his capacity as Commissioner; W. ROBERT KEATING, in his capacity
as Commissioner; DEIRDRE K. MANNING, in her capacity as
Commissioner; EUGENE J. SULLIVAN, JR., in his capacity as
Commissioner,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before
Lynch, Lipez, and Howard,
Circuit Judges.

John W. McGuinness, with whom Glenn B. Manishin, Kelley Drye
& Warren LLP, William J. Rooney, and Jeffrey Melick were on brief,
for appellant.
Scott H. Angstreich, with whom David F. Engstrom, Kellogg,
Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Bruce P. Beausejour,
Richard P. Owens, Keefe B. Clemons, Robert Weigel, and Gibson, Dunn
& Crutcher LLP were on brief, for appellee Verizon New England,
Inc.

May 30, 2007

**LYNCH**, **Circuit Judge**.   This appeal raises issues concerning the release of security when an appellant has previously been ordered to post that security as a condition for obtaining an injunction pending appeal.  See Fed. R. Civ. P. 65(c).  In this case, the district court released the security after this court had rejected the appeal and dissolved the injunction.

We affirm the district court's release of $16 million in security to appellee Verizon New England, Inc. ("Verizon"), over the protests of appellant Global NAPs, Inc. ("GNAPs").  In order to maintain the status quo pending appeal, Verizon had been enjoined from terminating its services to GNAPs for failure to pay access fees; GNAPs, in turn, had been ordered to provide security for the costs and damages Verizon would incur during the period of the injunction.  Our analysis construes Federal Rule of Civil Procedure 65(c) and adopts standards for the release of security under this rule.

## I. BACKGROUND

This marks the third time that aspects of this dispute have appeared in our court.  See Global NAPs, Inc. v. Verizon New Eng., Inc. (GNAPs I), 396 F.3d 16 (1st Cir.), cert. denied, 544 U.S. 1061 (2005); Global NAPs, Inc. v. Verizon New Eng., Inc. (GNAPs II), 444 F.3d 59 (1st Cir. 2006).  The parties' underlying litigation pertains to GNAPs' failure to make payments to Verizon, notwithstanding a December 2002 order from the Massachusetts

-2-

Department of Telecommunications and Energy (DTE) which required these payments. As reflected in a subsequent interconnection agreement between Verizon and GNAPs, the DTE order had required GNAPs to pay Verizon for Virtual NXX ("VNXX") calls originated by Verizon's Massachusetts customers and delivered to GNAPs.[1] See GNAPs II, 444 F.3d at 66.

In GNAPs I, we rejected a particular argument from GNAPs that it did not need to comply with the DTE's December 2002 order. See GNAPs I, 396 F.3d at 23. This resolved only part of the dispute. In GNAPs II, we rejected GNAPs' remaining arguments that the DTE's rulings conflicted with and were preempted by federal law, and so we affirmed the DTE order. See GNAPs II, 444 F.3d at 71-75. The current dispute pertains to a security posted after our decision in GNAPs I, and which was released to Verizon after our decision in GNAPs II.

A.      The Remand After GNAPs I

After our ruling in GNAPs I, Verizon notified GNAPs on March 17, 2005 that GNAPs had accrued more than $42 million in access charges (excluding late payment charges). Verizon further informed GNAPs that it would terminate services to GNAPs on April 19, 2005 if payments were not made. The companies later agreed to postpone the termination date to May 12, 2005, in order to explore

---

[1] For an explanation of VNXX calling, see GNAPs II, 444 F.3d at 63-64.

settlement possibilities. When the settlement discussions failed, GNAPs moved for a TRO and/or preliminary injunction to prevent disconnection while it litigated the GNAPs II case. See id. at 67 n.6.

On May 12, 2005, the district court indicated that it would maintain the status quo pending a resolution on the merits of GNAPs' preemption argument; the court stated at a hearing that it would grant GNAPs' motion, subject to GNAPs posting appropriate security. On June 2, 2005, the court entered the preliminary injunction which GNAPs had requested, conditioned on GNAPs providing security in the amount of $1 million (a condition that GNAPs fulfilled). The court also expedited the briefing schedule for the parties' cross-motions for summary judgment. On September 21, 2005, the district court denied GNAPs' motion for partial summary judgment, and it granted Verizon's and the DTE's cross-motions for partial summary judgment.

In light of its success in the district court, Verizon again notified GNAPs (this time by letter dated September 23, 2005) that it would soon terminate service for non-payment. GNAPs sought clarification from the district court on whether the preliminary injunction had been dissolved by the court's opinion, and the court confirmed that its decision had that effect. GNAPs then stipulated to the dismissal with prejudice of its remaining challenges to the DTE's decision, thereby freeing GNAPs to pursue an appeal.

**B.**          **GNAPs II and the Injunction Pending Appeal**

GNAPs next sought an injunction pending appeal, first from the district court, and then from this court, in order to prevent Verizon from terminating service. See id. at 68 n.8. GNAPs represented to both courts that without such an injunction it would "suffer a fatal revenue loss," and in its motion to this court it characterized the litigation as an "all-or-nothing dispute." GNAPs also represented that it had offered to pay Verizon, over time, the more than $56 million Verizon claimed was now due, which GNAPs asserted "would fully pay the access charges, if Verizon prevails here." That offer, according to GNAPs, required only that Verizon agree to refrain from cutting off service, and agree to return the sums paid if GNAPs prevailed on appeal.

The district court denied GNAPs' request for additional injunctive relief. But this court granted GNAPs' motion on November 2, 2005, and we enjoined Verizon from terminating service pending GNAPs' appeal. This injunction was contingent on GNAPs providing "additional security" in an amount to be set by the district court, and we remanded the issue of the amount and form of the security. In the district court, GNAPs proposed that the court set security -- beyond the $1 million GNAPs had already posted as security for the first injunction -- in the amount of $16,676,313. GNAPs further stated that it would post that amount by assigning

funds that Verizon's affiliates, most of which operated in other states and were not parties to the underlying suit, had withheld from GNAPs or its affiliates to secure debts in what Verizon claims are unrelated disputes. Not coincidentally, those withheld funds totaled $16,676,313.

The district court ordered GNAPs to post an additional $15 million in security. This was roughly $1.7 million less than the $16,676,313 in additional security that GNAPs had itself proposed as appropriate. Over Verizon's objection, the district court also permitted GNAPs to satisfy that requirement by assigning funds withheld by Verizon's affiliates.

On April 11, 2006, this court issued its ruling on the merits in GNAPs II, and we affirmed the district court's grant of summary judgment. See id. at 61. This court rejected GNAPs' claim that the Federal Communications Commission, in a decision known as the "ISP Remand Order," had altered the preexisting intercarrier payment rules for all calls delivered to ISPs. We instead agreed with Verizon that the ISP Remand Order preempted state-imposed payment rules only for calls where the caller and the ISP are located in the same local calling area. See id. at 71-75.

C.        **Dissolution of the Injunction and Release of the Security**

On April 13, 2006, Verizon moved this court to issue its mandate in GNAPs II early; in the alternative, it asked for an order lifting the injunction pending appeal, as either relief would

-6-

permit Verizon to terminate services to GNAPs for non-payment of access charges.

GNAPs opposed Verizon's motion on April 18, 2006. It contended for the first time that if access charges were due at all, GNAPs actually owed Verizon only about $7.5 million in total damages in the case. This amount was far less than the $56 million GNAPs had earlier offered to pay Verizon, and was also lower than the $16 million in security that GNAPs had previously posted. GNAPs' new argument was that the FCC's ISP Remand Order capped Verizon's access charges for VNXX calls to ISPs at $0.0007 per minute.

We granted Verizon's motion in part, vacating the injunction pending appeal later that same day, April 18, 2006.[2]

After this court vacated the injunction, and still on April 18, Verizon moved in the district court for the release of the $16 million in security. Its motion was supported by affidavits evidencing that the harm to Verizon from issuance of the injunction exceeded $16 million.

On May 2, 2006, the day GNAPs' opposition to Verizon's motion was due in the district court, GNAPs moved for leave to oppose that motion only after this court issued its mandate in

---

[2] On April 24, 2006, we also denied GNAPs' motion for reconsideration of our decision to vacate the injunction. The next day, GNAPs filed a petition for rehearing and rehearing en banc of this court's GNAPs II decision; this court denied the petition on May 4, 2006.

GNAPs II. Until that happened, GNAPs contended, the district court lacked jurisdiction. GNAPs requested that the district court give it "leave to submit the grounds for its opposition three days after [the district court] regains jurisdiction upon issuance of . . . the mandate." Verizon opposed GNAPs' motion on May 4, 2006, contending that the mandate's issuance was not necessary for the district court to release the security.

GNAPs did file an opposition in the district court on May 5, 2006, contesting Verizon's motion for release of security. GNAPs continued to press its argument that the district court did not have jurisdiction to consider Verizon's motion until after this court's mandate had issued. GNAPs also made three substantive arguments: (1) that release of the security was improper because this court's injunction pending appeal had not expressly stated that "the amount [GNAPs] posted is 'for payment for such costs and damages as may be incurred or suffered' by the enjoined party, if found to have been wrongfully enjoined;" (2) that this court's dissolution of the injunction pending appeal did not compel the conclusion that Verizon had been wrongfully enjoined; and (3) that due process entitled GNAPs to a "full and fair opportunity" to litigate the invoice amounts that Verizon had used as evidence of its harm from the injunction. GNAPs provided little elaboration

of, and no affidavit support for, its arguments disputing Verizon's proof.[3]

On May 15, 2006, this court issued its mandate in GNAPs II. That same day, GNAPs filed a motion in the district court seeking leave until May 22, 2006 to file a motion for an evidentiary hearing and discovery. The next day, May 16, the district court granted Verizon's previously filed motion and ordered the release to Verizon of the full $16 million in security. Simultaneously, the court issued an order denying GNAPs' May 2 motion for leave to wait until issuance of the mandate in order to oppose Verizon's request for the security, but granting GNAPs' May 15 motion.

GNAPs responded with two more motions in the district court. On May 16, 2006, GNAPs moved for a stay of the district court's order releasing the security. But on May 17, 2006, the district court clerk's office released the security to Verizon, mooting the motion. Then, on May 22, 2006, GNAPs moved for reconsideration of the district court's May 16 order, styling its motion as one seeking the "return [of] property previously deposited in [c]ourt," and also requesting discovery and an evidentiary hearing. GNAPs also, for the first time in the

---

[3] The sole elaboration in GNAPs' motion was that it briefly flagged the issues it claimed it wanted to litigate. GNAPs did not provide any reasons why those issues should be resolved in GNAPs' favor.

district court, attached two affidavits to its motion. The affidavit of Michael Couture purported to demonstrate that GNAPs owed Verizon only $563,077.60 for access charges accrued during the pendency of the two injunctions. The affidavit of Robert Fox was to similar effect. The district court denied GNAPs' motion on June 16.

GNAPs separately appealed two of the district court's orders: its May 16 order granting the release of security, and its June 16 order denying GNAPs' request for reconsideration. This court consolidated those appeals.

These consolidated appeals embody the latest efforts by GNAPs to delay or avoid payment of the sums past due to Verizon. The district court rejected those efforts and so do we.

## II. GNAPS' MANDATE ARGUMENT

GNAPs' first argument is procedural: it contends that the district court could not act on Verizon's motion to release the security until the mandate issued in GNAPs II. See United States v. Ferris, 751 F.2d 436, 440 (1st Cir. 1984) (explaining that during the pendency of an appeal, a district court lacks jurisdiction "to proceed with respect to any matters involved in the appeal"). The district court implicitly found that it had jurisdiction to act as it did, and we review that conclusion de novo. See Baella-Silva v. Hulsey, 454 F.3d 5, 10 (1st Cir. 2006).

-10-

The short answer to GNAPs' argument is that the district court in fact did not act to release any funds until after the mandate was issued. If there is anything to GNAPs' argument, it cannot be that the district court lacked jurisdiction to release the funds. Rather, GNAPs' only plausible grievance can be with the fact that the district court accepted Verizon's arguably premature motion, an acceptance which then triggered an impending deadline for GNAPs to respond.

We see no jurisdictional problem with the district court's acceptance of Verizon's motion. There are some exceptions to the rule that only one court at a time has jurisdiction, such as for transparently frivolous appeals, see, e.g., United States v. Brooks, 145 F.3d 446, 456 (1st Cir. 1998), certain modifications of forfeiture orders, see United States v. Hurley, 63 F.3d 1, 23-24 (1st Cir. 1995), and the posting of a supersedeas bond, see Trs. of the Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc., 935 F.2d 114, 119 (7th Cir. 1991), among other ancillary matters. As these examples illustrate, and as the Seventh Circuit has recognized, the "proposition that only one court at a time has jurisdiction" is a qualified rule "designed to prevent conflict among tribunals, as well as to prevent the waste of time and money that occurs if" a court changes a judgment while a case is pending in another court. Wis. Mutual Ins. Co. v. United States, 441 F.3d 502, 504 (7th Cir.

-11-

2006); see also Hurley, 63 F.3d at 24 (explaining that the purpose of the rule is to avoid "interference and inconsistency," and suggesting that it is unwise "to extend this [rule] further than its own rationale").

The key point of Verizon's April 18 motion was that it sought to demonstrate its damages from the injunction. That damages calculation involved no conflict with the appeal that was still technically pending in this court.

GNAPs nonetheless contends that Verizon's motion did present a conflict, because irrespective of the amount of damages, GNAPs could not be deemed liable on the security until it was determined that GNAPs in fact owed access charges to Verizon -- an issue that GNAPs says was pending in this court until we issued the mandate in GNAPs II. But we had vacated the injunction before the mandate issued; there was no realistic potential conflict. GNAPs could have been expected to treat GNAPs II as good law, notwithstanding the ministerial fact that the mandate had not yet issued. Cf. Wedbush, Noble, Cooke, Inc. v. SEC, 714 F.2d 923, 924 (9th Cir. 1983) (explaining that a court of appeals decision has stare decisis effect even before the mandate issues in a case). It is well established in this circuit that a district court can proceed, notwithstanding the technical pendency of an appeal, when it is clear that the appeal "constitutes a transparently frivolous attempt to impede the progress of the case." Brooks, 145 F.3d at

456. By like token, the district court could easily have concluded that GNAPs' procedural objection (i.e. its refusal to contest Verizon's calculations until the mandate issued) was an effort to delay.

If we thought that GNAPs had been disadvantaged somehow by the district court's acceptance of Verizon's filing on April 18, after we had vacated the injunction, that might be another issue (although not a jurisdictional one). But GNAPs was well aware from the date of our decision in GNAPs II, April 11, that it most likely would have to pay up on the security it had posted. GNAPs had adequate time to prepare its evidence and argument, and in fact it had over three weeks to prepare the opposition it did file on May 5.

### III. COMPLIANCE WITH RULE 65(c)

GNAPs next argues that the district court failed to comply with the federal rules when it released the full $16 million in security to Verizon.

A.        **The Legal Backdrop**

We start our analysis with the basic law. The security was given, under Federal Rule of Civil Procedure 65(c), upon the issuance of a preliminary injunction which restrained Verizon from terminating service to GNAPs pending the appeal in GNAPs II. Rule 65(c) states:

> No restraining order or preliminary injunction
> shall issue except upon the giving of security

> by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.
>
> The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

The terms of Rule 65(c) do not, in so many words, explicitly discuss how dissolution of the injunction affects payment of the security. But the Rule does implicitly address this when it states that the security is held for payment of costs and damages suffered by a party "who is found to have been wrongfully enjoined." See Coyne-Delany Co. v. Capital Dev. Bd., 717 F.2d 385, 390-91 (7th Cir. 1983). The implication is that when a party has been wrongfully enjoined, it may collect some or all of the security.

Our understanding of Rule 65(c) is also informed by the fact that if a bond had been posted as the security, recovery would be governed by Rule 65.1. Rule 65.1 in turn provides a summary procedure for the enforcement of liability against a surety. See Fed. R. Civ. P. 65.1. Such enforcement may be done on motion, without the need for filing an independent action. Id. Although the terms of Rule 65.1 apply only to sureties, courts have applied that rule's procedures when imposing liability on a principal as well. See Coyne-Delany, 717 F.2d at 391. The key inference is that when an injunction does cause damages, the principal or the

-14-

surety is "normally . . . required to pay the damages, at least up to the limit of the bond."  Id.

The operation of Rule 62 is also informative.[4]  Rule 62 grants the district court "power . . . [to] 'protect an enforceable judgment,'" which includes the power to "protect the winner from any subsequent harm suffered through appellate delay."  J. Perez & Cia., Inc. v. United States, 747 F.2d 813, 815 (1st Cir. 1984) (quoting Redding & Co. v. Russwine Constr. Corp., 417 F.2d 721, 727 (D.C. Cir. 1969)).  Our situation is analogous to security issued under Rule 62, insofar as the preliminary injunction was issued to

---

[4] Rule 62(c), "Injunction Pending Appeal," reads in pertinent part:

> When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Also significant is Rule 62(g), "Power of Appellate Court Not Limited," which provides:

> The provisions in this rule do not limit any power of any appellate court or of a judge or justice thereof to stay proceedings during the pendency of an appeal or to suspend, modify, restore, or grant an injunction during the pendency of an appeal or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered.

-15-

preserve the status quo, and GNAPs was required to post security pending appeal.

The Fifth Circuit, in Continuum Co. v. Incepts, Inc., 873 F.2d 801 (5th Cir. 1989), has provided a generally accepted explanation of the purposes served by requiring security pending appeal pursuant to Rule 65(c):

> (1) [I]t assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured, and (2) it provides the plaintiff with notice of the maximum extent of its potential liability, since the amount of the bond "is the limit of the damages the defendant can obtain for a wrongful injunction, . . . provided the plaintiff was acting in good faith."

Id. at 803 (footnote omitted) (omissions in original) (quoting Coyne-Delany, 717 F.2d at 391); see also Sprint Commc'ns Co. v. CAT Comc'ns. Int'l, Inc., 335 F.3d 235, 240 n.5 (3d Cir. 2003); Note, Security for Interlocutory Injunctions Under Rule 65(c): Exceptions to the Rule Gone Awry, 46 Hastings L.J. 1863, 1866, 1870-71 (1995). The important points are that the security is generally destined for a wrongfully enjoined party, and also that the party seeking the injunction has had fair notice of the costs that are likely to be paid for the injunction's issuance.[5]

---

[5] Some courts, like the Continuum court, make use of the fiction that a security bond can be viewed as a contract under which the plaintiff "'agree[d]' to the bond amount as the 'price' of a wrongful injunction." 873 F.2d at 803. The key point, in our

-16-

These principles have important implications for the dispute before us. This court previously determined that an injunction was appropriate to preserve the status quo pending appeal, in light of GNAPs' argument that it would be forced out of business unless an injunction was entered. GNAPs made a business judgment that it was willing to incur the "cost" of a possibly wrongful injunction in order to take its appeal. Yet GNAPs now seeks to avoid payment of most of the security which had been entered to secure Verizon against the injunction.

Before explaining why GNAPs cannot avoid this payment, we clarify one more important point about the applicable law. What is at issue in this case is not security for the payment of damages on an ultimate judgment on the merits. Rather, we are concerned with security issued for interim harms suffered by an appellee, when the appellee has been enjoined in order to preserve the status quo pending appeal. As Justice Stevens explained in <u>Edgar</u> v. <u>MITE Corp.</u>, 457 U.S. 624 (1982):

> Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully. The bond, in effect, is the moving party's warranty that

view, is not the analogy to contract, but rather the recognition that the party seeking the injunction has notice of the injunction's price.

-17-

the law will uphold the issuance of the
injunction.

Id. at 649 (Stevens, J., concurring in part and concurring in the
judgment) (footnote omitted); see also N.E. Airlines, Inc. v.
Nationwide Charters & Conventions, Inc., 413 F.2d 335, 338 (1st
Cir. 1969) (explaining that a security issued under Rule 65(c)
protects against damages "suffered by reason of the [wrongfulness]
of [a] preliminary injunction"). Both GNAPs and Verizon agree that
the security in this case was designed to protect Verizon from the
interim harms caused by the injunction.[6]

**B.        The District Court's Compliance**

With these background principles of law clarified, we
consider the parties' areas of contention. GNAPs presents three
categories of arguments. First, GNAPs argues that the district
court made no finding, as required by Rule 65(c), that Verizon was
"wrongfully enjoined." Second, GNAPs argues that Verizon has not

---

[6] GNAPs does contend, however, that the district court took a
different view of the security and that it released the security
based on pre-injunction damages that Verizon claimed it had
suffered. We do not understand the district court to have acted in
this manner; our affirmance of the district court's actions is
based on Verizon's demonstration of the actual harm it suffered
during the injunction.
    To the extent that GNAPs is making a different argument -- a
claim that security pending appeal cannot be released until there
is a final judgment on the merits of the case awarding damages --
we reject that argument as illogical, and inconsistent with the
premise of Rule 65(c) security. Dissolution of an injunction is
itself a final determination which permits a party to seek security
posted with respect to the injunction. See 11A C. Wright et al.,
Federal Practice & Procedure § 2972, at 458-59 (2d ed. 1995).

-18-

shown its entitlement to the full security. Third, GNAPs asserts it was entitled to an evidentiary hearing to contest Verizon's claimed damages.

### 1. Wrongfully Enjoined

On the first point, GNAPs' basic proposition is that under Rule 65(c), an injunction cannot be wrongful unless it is shown that issuance of the injunction was an abuse of discretion at the time it was issued. Almost every other circuit to have considered this issue has rejected GNAPs' interpretation. See Sprint, 335 F.3d at 242 n.9;[7] Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc., 16 F.3d 1032, 1036 & n.4 (9th Cir. 1994); Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1054 (2d Cir. 1990); Atomic Oil Co. of Okla. v. Bardahl Oil Co., 419 F.2d 1097, 1099 (10th Cir. 1969); cf. Coyne-Delany, 717 F.2d at 389-93 (implicitly rejecting GNAPs' argument, although indicating that certain considerations may nonetheless justify withholding some or all of a security from a wrongfully enjoined party). But see H & R Block, Inc. v. McCaslin, 541 F.2d 1098, 1099-1100 (5th

---

[7] In Sprint, a case on which GNAPs mistakenly relies, the court, in our view, rejected GNAPs' position. It is true that the Sprint court acknowledged that dissolution of an injunction does not mean "that the injunction was improvidently granted by the original judge." 335 F.3d at 242 n.9. But that was simply an acknowledgment that a preliminary injunction can be proper at the time it was issued, yet become improper after the passage of time. See id. In any event, in the very next paragraph the court went on to clarify that an injunction can be "wrongful" for Rule 65(c) purposes even when the initial issuance of the injunction was proper. See id. (citing Blumenthal, 910 F.2d at 1054).

Cir. 1976) (per curiam). This court has not construed the term before.

We now adopt the majority position, and we hold that under Rule 65(c), a party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing. See Nintendo, 16 F.3d at 1036; see also Slidell, Inc. v. Millennium Inorganic Chems., Inc., 460 F.3d 1047, 1059 (8th Cir. 2006); Blumenthal, 910 F.2d at 1054.

Applying that rule to this case is quite simple. The issue of whether Verizon was wrongfully enjoined was determined when we issued our opinion in GNAPs II and rejected GNAPs' arguments on the merits of its position. We then vacated the injunction because Verizon was entitled, and had been entitled all along, to cut off services to GNAPs.

2.      Determining the Entitlement to Security

GNAPs' second point is that Verizon presented insufficient evidence of its entitlement to the full security. We disagree and think it helpful to split this point into two smaller issues: whether Verizon had established it was entitled to provable damages, and whether Verizon had in fact proved the amount of damages it suffered.

On the first issue, while there is a split of authority, we adopt the majority rule that there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the security

-20-

executed so as to recover provable damages up to the amount of the security.  See Milan Express, Inc. v. Averitt Express, Inc., 254 F.3d 966, 981 (11th Cir. 2001); Nintendo, 16 F.3d at 1036-37; Nat'l Kidney Patients Ass'n v. Sullivan, 958 F.2d 1127, 1134-35 (D.C. Cir. 1992); Coyne-Delany, 717 F.2d at 391-92.  But see H & R Block, 541 F.2d at 1099-1100.  Under this presumption, a district court must have a good reason to depart from the preference for recovery of security granted under Rule 65(c).  Coyne-Delany, 717 F.2d at 391-92.

        As Judge Posner put it in Coyne-Delany, not only is this rule "implied by the text of Rule 65(c)[,] but it makes the law more predictable and discourages the seeking of preliminary injunctions on flimsy (though not necessarily frivolous) grounds."  Id. at 392.  And as several circuits have pointed out, there are ancillary benefits to adoption of the presumption.  See Nintendo, 16 F.3d at 1037; Nat'l Kidney, 958 F.2d at 1134-35; see also Note, Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c), 99 Harv. L. Rev. 828, 838 n.36 (1986); Note, Interlocutory Injunctions and the Injunction Bond, 73 Harv. L. Rev. 333, 342 (1959).

        Applying this presumption requires slightly more explanation.  Earlier, this court avoided stating a standard of appellate review of the district court's release of the security. It is often said, sometimes loosely, that appellate review of this

-21-

release is for abuse of discretion. See, e.g., Milan Express, 254 F.3d at 981; Nat'l Kidney, 958 F.2d at 1135. But since we have adopted a presumption, that presumption in turn affects how we apply the abuse of discretion standard. This amounts to stricter review along the sliding scale of the abuse standard. See Coyne-Delany, 717 F.2d at 392 ("When rules prescribe a course of action as the norm but allow the district court to deviate from it, the court's discretion is more limited . . . . The judge must have a good reason for departing from [the presumption of recovery] in a particular case.").

Here, the district court correctly concluded that it had no good reason to refrain from releasing the security to Verizon so long as Verizon could prove the damages it suffered. Perhaps if there had been a demonstration that Verizon had failed to mitigate its damages, GNAPs would have had a stronger case that Verizon was not entitled to all of the damages it had suffered. See id. at 392. But no such showing was made here. There was no abuse of discretion.[8]

That brings us to the second question, whether Verizon in fact adequately proved its damages. We note that the issue of the amount of appropriate security was litigated when the district

---

[8] It is not sufficient for GNAPs to point out that it pursued its appeal in good faith. The award of release of security is compensatory, not punitive. Coyne-Delany, 717 F.2d at 392.

court set the amount.[9]  That previously determined amount was the amount which the court released -- not more, not less.  Of course, Verizon was still required to establish that the predicted harm was the actual harm.  But that proof did not need not to be to a mathematical certainty.  See Nintendo, 16 F.3d at 1039.  From our point of view, not requiring mathematical exactitude has the benefit of keeping both parties honest and focused in the initial setting of the security.  This will minimize later gamesmanship.

Indeed, the district court was entitled to take into account GNAPs' earlier representation that it was willing to post additional security in the sum of $16,676,313 (for a total of almost $18 million) to satisfy any harm to Verizon from issuance of the injunction.  True, GNAPs did not flatly concede that Verizon's damages from an injunction would reach that level.  But the fact that GNAPs so readily accepted this security level, and the implicit billing rate that it reflected, stands in stark contrast to GNAPs' current claim that Verizon used an incorrect rate and that GNAPs actually accrued less than $600,000 in charges during the injunction period.

Further, Verizon did file an affidavit with the district court and it provided evidence that the actual harm from issuance of the injunction was greater than the secured sum.  That affidavit

---

[9] Verizon in fact had requested that the district court impose a larger sum in security than what was ultimately imposed.

asserted that between February 23, 2005 (the billing date which Verizon cited in its March 17, 2005 letter threatening to terminate service), and April 18, 2006 (the date that this court dissolved the preliminary injunction), GNAPs had accrued over $24.7 million in access charges.[10] Of course, this time period exceeded by several months the period when the injunction was actually in force (a period that began, as a practical matter, on May 12, 2005). Yet a simple calculation shows that even after excluding the non-injunction days from this amount, it is likely that Verizon's damages still exceeded the security amount of $16 million.[11] GNAPs chose not to provide evidence to counter Verizon's affidavit when

---

[10] The affidavit also stated that of that $24.7 million, approximately $11.9 million was attributable to charges accrued after September 23, 2005 (the date on which the district court clarified that it had dissolved the first preliminary injunction). One could argue that GNAPs' security for the second preliminary injunction is conceptually separate from its security for the first preliminary injunction, with the result that $1 million secured the first injunction and $15 million secured the second injunction. Such an argument would suggest that Verizon was entitled to less than $11.9 million of the $15 million securing the second injunction. However, GNAPs did not raise this issue in the district court, even in its motion for reconsideration, and so we assume that the full $16 million secured the time period for both injunctions combined.

[11] The time period covered by Verizon's affidavit spanned 419 days. 78 of those days preceded May 12, 2005. Additionally, as many as 42 of the remaining days were attributable to the time period between the dissolution of the first preliminary injunction, and the imposition of the second injunction -- days which should arguably be excluded as well. Even so, 299 of the 419 affidavit days, or approximately 71.36%, plainly covered the injunction period. Multiplying that percentage by the affidavit's claimed damages still yields more than $17 million, which exceeds the security amount by over $1 million.

-24-

it filed its opposition in the district court.  It instead decided to wait until its motion for reconsideration to contest Verizon's evidence.  We will not relieve GNAPs of its tactical choice.

### 3. Evidentiary Hearing

GNAPs' next argument is that the district court was required, as a matter of due process, to have held an evidentiary hearing on the amount of Verizon's damages.  But against the background that we have discussed, GNAPs' claim rings hollow.  The district court had a sufficient basis in the evidence to determine that issuance of the injunction had caused at least $16 million in harm.  GNAPs had an opportunity to respond to Verizon's affidavits, and it even attempted a partial response on May 5 -- albeit one that failed to put forth any evidence to counter Verizon's submissions.[12]

## C.      Denial of Motion for Reconsideration/Return of Property

Finally, GNAPs contends that the district court erred in denying GNAPs' "Motion for Return of Property."  Although styled as

---

[12] GNAPs points out that on May 15, 2006, it asked the district court for leave until May 22 to file its motion to request an evidentiary hearing.  And it further points out that the requested leave was granted by the district court.  But when the court granted GNAPs' requested leave, it did so simultaneously with the court's May 16 order releasing the posted security.  In this circumstance, we understand the district court simply to have been allowing GNAPs to file what would in effect be a motion for reconsideration that could include a request for an evidentiary hearing.  We do not understand the district court to have been excusing GNAPs' delay in opposing Verizon's motion.  Indeed, our understanding is confirmed by the denial of GNAPs' motion to wait until issuance of the mandate to oppose the release of security.

such, we think GNAPs' motion should properly be understood as a motion for reconsideration. Irrespective of how a party titles his motion, "'a post-judgment motion made within ten days of the entry of judgment that questions the correctness of a judgment is properly construed as a motion to alter or amend judgment under Fed. R. Civ. P. 59(e).'" Aybar v. Crispin-Reyes, 118 F.3d 10, 14 n.3 (1st Cir. 1997) (quoting Skagerberg v. Oklahoma, 797 F.2d 881, 883 (10th Cir. 1986)). GNAPs' statements in the motion suggest that it too may have understood its motion as effectively seeking reconsideration.

As a general matter, a motion for reconsideration may only be granted if the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations. See Palmer v. Champion Mortgage, 465 F.3d 24, 30 (1st Cir. 2006); Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005). Our review of the denial of such a motion is for abuse of discretion. Palmer, 465 F.3d at 30.

GNAPs' motion to reconsider developed two lines of argument that it had cursorily flagged in its opposition to Verizon's motion. First, GNAPs contended that Verizon had used an incorrect billing rate. Second, GNAPs argued that Verizon had overstated the number of minutes for which GNAPs owed access charges: Verizon's affidavits were not limited to the period the injunction was actually in force, Verizon had allegedly billed for

certain calls that should have been exempt from the access charges Verizon imposed, and Verizon's private communications with GNAPs had allegedly conceded that Verizon's stated number of minutes was too high. GNAPs provided affidavits in support of its arguments.

The district court did not abuse its discretion in denying GNAPs' motion. Generally, a party is not entitled to present new arguments on a motion for reconsideration. <u>Aybar</u>, 118 F.3d at 16. Here there may well have been a strategic choice by GNAPs to cause delay in the release of the security, including by withholding material arguments until reconsideration. Even if the delayed presentation resulted from nothing more than GNAPs having second thoughts about its best arguments, parties are bound by the choices they make.[13]

## IV. CONCLUSION

We <u>affirm</u> the district court's orders. Costs are awarded to Verizon.

---

[13] Nor does it matter that the district court had granted GNAPs leave to file this post-judgment motion. GNAPs had only requested this leave on May 15, and leading up to that date GNAPs certainly had ample time to develop its arguments and gather the needed evidence. The district court did not abuse its discretion when it permitted GNAPs to <u>file</u> its post-judgment motion, but then ultimately concluded that it would not alter its judgment based on these new arguments.

-27-