OPINION
RENDELL, Circuit Judge:
The issue presented before the en banc court is whether SB 2460, which the New Jersey Legislature enacted in 2014 to partially repeal certain prohibitions on sports gambling (the “2014 Law”), violates federal law. 2014 N.J. Sess. Law Serv. Ch. 62, codified at N.J. Stat. Ann. §§ 5:12A-7 to - *392 9. The District Court held that the 2014 Law violates the Professional and Amateur Sports Protection Act (“PASPA”), 28 U.S.C. §§ 3701-3704. A panel of this Court affirmed this ruling in a divided opinion which was subsequently vacated upon the grant of the Petition for Rehearing en banc. We now hold that the District Court correctly ruled that because PASPA, by its terms, prohibits states from authorizing by law sports gambling, and because the 2014 Law does exactly that, the 2014 Law violates federal law. We also hold that we correctly ruled in Chñstie 1 that PASPA does not commandeer the states in a way that runs afoul of the Constitution.
I. Background
Congress passed PASPA in 1992 to prohibit state-sanctioned sports gambling. PASPA provides:
It shall be unlawful for—
(1) a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or
(2) a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity, a lottery, sweepstakes, or other betting, gambling, or wagering scheme based ... on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.
28 U.S.C. § 3702 (emphasis added). PASPA defines “governmental entity” to include states and their political subdivisions. Id. § 3701(2). It includes a remedial provision that permits any sports league whose games are or will be the subject of sports gambling to bring an action to enjoin the gambling. Id. § 3703.
Congress included in PASPA exceptions for state-sponsored sports wagering in Nevada and sports lotteries in Oregon and Delaware, and also an exception for New Jersey but only if New Jersey were to enact a sports gambling scheme within one year of PASPA’s enactment. Id. § 3704(a). New Jersey did not do so, and thus the PASPA exception expired. Notably, sports gambling was prohibited in New Jersey for many years by statute and by the New Jersey Constitution. See, e.g., N.J. Const. Art. IV § VII ¶ 2; N.J. Stat. Ann. § 2C:37-2; N.J. Stat. Ann. § 2A:40-1. In 2010, however, the New Jersey Legislature held public hearings on the advisability of allowing sports gambling. These hearings included testimony that sports gambling would generate revenues for New Jersey’s struggling casinos and racetracks. In 2011, the Legislature held a referendum asking New Jersey voters whether sports gambling should be permitted, and sixty-four percent voted in favor of amending the New Jersey Constitution to permit sports gambling. The constitutional amendment provided:
It shall also be lawful for the Legislature to authorize by law wagering at casinos or gambling houses in Atlantic City on the results of any professional, college, or amateur sport or athletic event, except that wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place....
N.J. Const. Art. IV, §VII, ¶2(0). The amendment thus permitted the New Jersey Legislature to “authorize by law” sports “wagering at casinos or gambling houses in Atlantic City,” except that wagering was not permitted on New Jersey college teams or on any collegiate event occurring in New Jersey. An additional section of the amendment permitted the Legislature to “authorize by law” sports *393 “wagering at current or former running and harness horse racetracks,” subject to the same restrictions regarding New Jersey college teams and collegiate events occurring in New Jersey. Id. ¶ 2(F).
After voters approved the sports-wagering constitutional amendment, the New Jersey Legislature enacted the Sports Wagering Act in 2012 (“2012 Law”), which provided for regulated sports wagering at New Jersey’s casinos and racetracks. N.J. Stat. Ann. §§ 5:12A-1 et seq. (2012). The 2012 Law established a comprehensive regulatory scheme, requiring licenses for operators and individual employees, extensive documentation, minimum cash reserves, and Division of Gaming Enforcement access to security and surveillance systems.
Five sports leagues[1] sued to enjoin the 2012 Law as violative of PASPA.[2] The New Jersey Parties did not dispute that the 2012 Law violated PASPA, but urged instead that PASPA was unconstitutional under the anti-commandeering doctrine. The District Court held that PASPA was constitutional and enjoined implementation of the 2012 Law. The New Jersey Parties appealed, and we affirmed in National Collegiate Athletic Ass’n v. Governor of New Jersey, 730 F.3d 208 (3d Cir. 2013) (Christie I).
In Christie I, we rejected the New Jersey Parties’ argument that PASPA was unconstitutional by commandeering New Jersey’s legislative process. In doing so, we stated that “[njothing in [PASPA’s] words requires that the states keep any law in place. All that is prohibited is the issuance of gambling ‘license[sj’ or the affirmative ‘authorization] by law’ of gambling schemes.” Id. at 232 (alterations in original). The New Jersey Parties had urged that PASPA commandeered the state because it prohibited the repeal of New Jersey’s prohibitions on sports gambling; they reasoned that repealing a statute barring an activity would be equivalent to authorizing the activity, and “authorizing” was not allowed by PASPA. We rejected that argument, observing that “PASPA speaks only of ‘authorizing by law’ a sports gambling scheme,” and “[w]e [did] not see how having no law in place governing sports wagering is the same as authorizing it by law.” Id. (emphasis in original). We further emphasized that “the lack of an affirmative prohibition of an activity does not mean it is affirmatively authorized by law. The right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people.” Id. (emphasis in original). In short, we concluded that the New Jersey Parties’ argument rested *394 on a “false equivalence between repeal and authorization.” Id. at 233. The New Jersey Parties appealed to the Supreme Court of the United States, which denied certiorari.
Undeterred, in 2014, the Legislature passed the 2014 Law, SB 2460, which provided in part:
[A]ny rules and regulations that may require or authorize any State agency to license, authorize, permit or otherwise take action to allow any person to engage in the placement or acceptance of any wager on any professional, collegiate, or amateur sport contest or athletic event, or that prohibit participation in or operation of a pool that accepts such wagers, are repealed to the extent they apply or may be construed to apply at a casino or gambling house operating in this State in Atlantic City or a running or harness horse racetrack in this State, to the placement and acceptance of wagers on professional, collegiate, or amateur sport contests or athletic events....
N.J. Stat. Ann. § 5:12A-7. The 2014 Law specifically prohibited wagering on New Jersey college teams’ competitions and on any collegiate competition occurring in New Jersey, and it limited sports wagering to “persons 21 years of age or older situated at such location[s],” namely casinos and racetracks. Id.
II. Procedural History and Parties’ Arguments
The Leagues filed suit to enjoin the New Jersey Parties from giving effect to the 2014 Law. The District Court held that the 2014 Law violates PASPA, granted summary judgment in favor of the Leagues, and issued a permanent injunction against the Governor of New Jersey, the Director of the New Jersey Division of Gaming Enforcement, and the Executive Director of the New Jersey Racing Commission (collectively, the “New Jersey Enjoined Parties”).[3] The District Court inter *395 preted Christie I as holding that PASPA offers two choices to states: maintaining prohibitions on sports gambling or completely repealing them. It reasoned that the 2014 Law runs afoul of PASPA because the 2014 Law is a partial repeal that necessarily results in sports wagering with the State’s imprimatur. The New Jersey Parties appealed.
On appeal, the New Jersey Parties argue that the 2014 Law does not constitute an authorization in violation of PASPA and it is consistent with Christie I because the New Jersey Legislature effected a repeal-er as Christie I specifically permitted.
The Leagues urge that the 2014 Law violates PASPA because it “authorizes by law” sports wagering and also impermissi-bly “licenses” the activity by confining the repeal of gambling prohibitions to licensed gambling facilities and thus, in effect, enlarging the terms of existing gaming licenses. The United States submitted an amicus brief in support of the Leagues.
A panel of this Court affirmed in a divided opinion, which was subsequently vacated. Because we, sitting en banc, essentially agree with the reasoning of the panel majority’s opinion, we incorporate much of it verbatim in this opinion.
III. Analysis[4]
A. The 2014 Law Violates PASPA ■
As a preliminary matter, we acknowledge the 2014 Law’s salutary purpose in attempting to legalize sports gambling to revive its troubled casino and racetrack industries. The New Jersey Assembly Gaming and Tourism Committee chairman stated, in regard to the 2014 Law, that “[w]e want to give the racetracks a shot in the arm. We want to help Atlantic City. We want to do something for the gaming business in the state of New Jersey, which has been under tremendous duress....” (App. 91.) New Jersey State Senator Ray Lesniak, a sponsor of the law, has likewise stated that “[sjports betting will be a lifeline to the casinos, ■ putting people to work and generating economic activity in a growth industry.” (App. 94.) And New Jersey State Senator Joseph Kyrillos stated that “New Jersey’s continued prohibition on sports betting at our casinos and racetracks is contrary to our interest of supporting employers that provide tens of thousands of jobs and add billions to our state’s economy” and that “[sjports betting will help set New Jersey’s wagering facilities apart from the competition and strengthen Monmouth Park and our struggling casino industry.” (App. 138.) PASPA has clearly stymied New Jersey’s attempts to revive its casinos and racetracks and provide jobs for its workforce.
Moreover, PASPA is not without its critics, even aside from its economic impact. It has been criticized for prohibiting an activity, i.e., sports gambling, that its critics view as neither immoral nor dangerous. It has also been criticized for encouraging the spread of illegal sports gambling and for making it easier to fix games, since it precludes the transparency that accompanies legal activities. Simply put, “[w]e are cognizant that certain questions related to this case — whether gam *396 bling on sporting events is harmful to the games’ integrity and whether states should be permitted to license and profit from the activity — engender strong views.” Christie I, 730 F.3d at 215. While PASPA’s provisions and its reach are controversial (and, some might say, unwise), “we are not asked to judge the wisdom of PASPA” and “[i]t is not our place to usurp Congress’ role simply because PASPA may have become an unpopular law.” Id. at 215, 241. We echo Christie I in noting that “New Jersey and any other state that may wish to legalize gambling on sports ... are not left without redress. Just as PASPA once gave New Jersey preferential treatment in the context of gambling on sports, Congress may again choose to do so or ... may choose to undo PASPA altogether.” Id. at 240-41. Unless that happens, however, we are duty-bound to interpret the text of the law as Congress wrote it.
We now turn to the primary question before us: whether the 2014 Law violates PASPA. We hold that it does. Under PASPA, it shall be unlawful for “a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact” sports gambling. 28 U.S.C. § 3702(1). We conclude that the 2014 Law violates PASPA because it authorizes by law sports gambling.
First, the 2014 Law authorizes casinos and racetracks to operate sports gambling while other laws prohibit sports gambling by all other entities. Without the 2014 Law, the sports gambling prohibitions would apply to casinos and racetracks. Appellants urge that the 2014 Law does hot provide authority for sports gambling because we previously held that “[t]he right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people” and that “[w]e do not see how having no law in place governing sports wagering is the same as authorizing it by law.” Christie I, 730 F.3d at 232. But this is not a situation where there are no laws governing sports gambling in New Jersey. Absent the 2014 Law, New Jersey’s myriad laws prohibiting sports gambling would apply to the casinos and racetracks. Thus, the 2014 Law provides the authorization for conduct that is otherwise clearly and completely legally prohibited.
Second, the 2014 Law authorizes sports gambling by selectively dictating where sports gambling may occur, who may place bets in such gambling, and which athletic contests are permissible subjects for such gambling. Under the 2014 Law, New Jersey’s sports gambling prohibitions are specifically removed from casinos, gambling houses, and horse racetracks as long as the bettors are people age 21 or over, and as long as there are no bets on either New Jersey college teams or collegiate competitions occurring in New Jersey. The word “authorize” means, inter alia, “[t]o empower; to give a right or authority to act,” or “[t]o permit a thing to be done in the future.” Black’s Law Dictionary 133 (6th ed. 1990).[5] The 2014 Law allows casinos and racetracks and their patrons to engage, under enumerated circumstances, in conduct that other businesses and their patrons cannot do. That selectiveness constitutes specific permission and empowerment.
Appellants urge that because the 2014 Law is only a “repeal” removing prohibitions against sports gambling, it is not an “affirmative authorization” under Christie I. To the extent that in Christie I we took *397 the position that a repeal cannot constitute an authorization, we now reject that reasoning. Moreover, we do not adopt the District Court’s view that the options available to a state are limited to two. Neither of these propositions were necessary to their respective rulings and were, in essence, dicta. Furthermore, our discussion of partial versus total repeals is similarly unnecessary to determining the 2014 Law’s legality because the question presented here is straightforward — i.e., what does the law do — and does not turn on the way in which the state has enacted its directive.
The presence of the word “repeal” does not prevent us from examining what the provision actually does, and the Legislature’s use of the term does not change that the 2014 Law selectively grants permission to certain entities to engage in sports gambling. New Jersey’s sports gambling prohibitions remain, and no one may engage in such conduct except those singled out in the 2014 Law. While artfully couched in terms of a repealer, the 2014 Law essentially provides that, notwithstanding any other prohibition by law, casinos and racetracks shall hereafter be permitted to have sports gambling. This is an authorization.
Third, the exception in PASPA for New Jersey, which the State did not take advantage of before the one-year time limit expired, is remarkably similar to the 2014 Law. The exception states that PAS-PA does not apply to “a betting, gambling, or wagering scheme ... conducted exclusively in casinos ..., but only to the extent that ... any commercial casino gaming scheme was in operation ... throughout the 10-year period” before PASPA was enacted. 28 U.S.C. § 3704(a)(3)(B). The exception would have permitted sports gambling at New Jersey’s casinos, which is just what the 2014 Law does. We can easily infer that, by explicitly excepting a scheme of sports gambling in New Jersey’s casinos from PASPA’s prohibitions, Congress intended that such a scheme would violate PASPA. If Congress had not perceived that sports gambling in New Jersey’s casinos would violate PASPA, then it would not have needed to insert the New Jersey exception. In other words, if sports gambling in New Jersey’s casinos does not violate PASPA, then PASPA’s one-year exception for New Jersey would have been superfluous. We will not read statutory provisions to be surplusage. See Marx v. Gen. Revenue Corp., — U.S. -, 133 S.Ct. 1166, 1178, 185 L.Ed.2d 242 (2013) (“[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.”). In order to avoid rendering the New Jersey exception surplusage, we must read the 2014 Law as authorizing a scheme that clearly violates PASPA.[6]
As support for their argument that the 2014 Law does not violate PASPA, Appellants cite the 2014 Law’s construction provision, which provides that “[t]he provisions of this act ... are not intended and shall not be construed as causing the State to sponsor, operate, advertise, promote, license, or authorize by law or compact” sports wagering. N.J. Stat. Ann. § 5:12A-8. This conveniently mirrors PASPA’s language providing that states may not “sponsor, operate, advertise, promote, license, or authorize by law or compact” sports wagering. 28 U.S.C. § 3702(1).
*398 The construction provision does not save the 2014 Law. States may not use clever drafting or mandatory construction provisions to escape the supremacy of federal law. Cf. Haywood v. Drown, 556 U.S. 729, 742, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009) (“[T]he Supremacy Clause cannot be evaded by formalism.”); Howlett ex rel. Howlett v. Rose, 496 U.S. 356, 382-83, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (“[t]he force of the Supremacy Clause is not so weak that it can be evaded by mere mention of’ a particular word). In the same vein, the New Jersey Legislature cannot use a targeted construction provision to limit the reach of PASPA or to dictate to a court a construction that would limit that reach. The 2014 Law violates PASPA, and the construction provision cannot alter that fact.
Appellants also draw a comparison between the 2014 Law and the 2012 Law, which involved a broad regulatory scheme, as evidence that the 2014 Law does not violate PASPA. It is true that the 2014 Law does not set forth a comprehensive scheme or provide for a state regulatory role, as the 2012 Law did. However, PAS-PA does not limit its reach to active state involvement or extensive regulation of sports gambling. It prohibits a range of state activity, the least intrusive of which is “authorization” by law of sports gambling.
We conclude that the 2014 Law violates PASPA because it authorizes by law sports gambling.[7]
B. PASPA Does Not Impermissibly Commandeer the States
Appellants expend significant effort in this appeal revisiting our conclusion in Christie I that PASPA does not unconstitutionally commandeer the states. They *399 root this effort in the District Court’s erroneous conclusion that PASPA presents states with a binary choice — either maintain a complete prohibition on sports wagering or wholly repeal state prohibitions. In Christie I, we engaged in a lengthy discussion to rebut Appellants’ assertion that if we conclude that New Jersey’s repeal of its prohibition is not permitted by PASPA, then it has unconstitutionally commandeered New Jersey. In so doing, we discussed the Supreme Court’s clear case law on commandeering. Our prior conclusion that PASPA does not run afoul of anti-commandeering principles remains sound despite Appellants’ attempt to call it into question using the 2014 Law as an exemplar.

1. Anti-Commandeering Jurisprudence

As we noted in Christie I, the Supreme Court’s anti-commandeering principle rests on the conclusion that “Congress ‘lacks the power directly to compel the States to require or prohibit’ acts which Congress itself may require or prohibit.” Christie I, 730 F.3d at 227 (quoting New York v. United States, 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)). In our prior survey of the anti-commandeering case law in Christie I, we grouped four commandeering cases upholding the federal laws at issue into two categories: (1) permissible regulation in a pre-emptible field, Hodel v. Virginia Surface Min. & Reclamation Ass’n, Inc., 452 U.S. 264, 101 S.Ct. 2389, 69 L.Ed.2d 1 (1981), and F.E.R.C. v. Mississippi, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); and (2) prohibitions on state action, South Carolina v. Baker, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988) and Reno v. Condon, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). The Supreme Court has struck down federal laws on anti-commandeering grounds in only two cases, New York v. United States and Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). We summarize our prior review below.
First, congressional action in passing laws in otherwise pre-emptible fields has withstood attack in cases where the states were not compelled to enact laws or implement federal statutes or regulatory programs themselves. In Hodel, the Supreme Court upheld the constitutionality of a law that imposed federal standards for coal mining. The law left states a choice. A state could “assume permanent regulatory authority over ... surface coal mining operations” and “submit a proposed permanent program” that “demonstrate^] that the state legislature has enacted laws implementing the environmental protection standards ... and that the State has the administrative and technical ability to enforce the[ ] standards.” Hodel, 452 U.S. at 271, 101 S.Ct. 2389. However, if a state chose not to assume regulatory authority, the federal government would “administer[ ] the Act within that State and continue[ ] as such unless and until a ‘state program’ [wa]s approved.” Id. at 272, 101 S.Ct. 2389. As we described in Christie I:
The Supreme Court upheld the provisions, noting that they neither compelled the states to adopt the federal standards, nor required them “to expend any state funds,” nor coerced them into “participat[ing] in the federal regulatory program in any manner whatsoever.” [Hodel, 452 U.S.] at 288, 101 S.Ct. 2389. The Court further concluded that Congress could have chosen to completely preempt the field by simply assuming oversight of the regulations itself. Id. It thus held that the Tenth Amendment posed no obstacle to a system by which Congress “chose to allow the States a regulatory role.” Id. at 290, 101 S.Ct. 2389. As the Court later characterized *400 Hodel, the scheme there did not violate the anti-commandeering principle because it “merely made compliance with federal standards a precondition to continued state regulation in an otherwise preempted field.” Printz v. United States, 521 U.S. 898, 926, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).
Christie I, 730 F.3d at 227-28. The Supreme Court’s opinion in F.E.R.C. v. Mississippi the following year confirmed its view that a law does not unconstitutionally commandeer the states when the law does not impose federal requirements on the states, but leaves states the choice to decline to implement federal standards. 456 U.S. 742, 767-68, 102 S.Ct. 2126 (upholding a provision that required state utility companies to expend state resources to “consider” enacting federal standards, but did not require , states to enact those standards).
Second, the Supreme Court has found Congress’s prohibition of certain state actions to not constitute unconstitutional commandeering. In South Carolina v. Baker, the Court upheld federal laws that prohibited the issuance of bearer bonds, which required states to amend legislation to be in compliance. 485 U.S. at 511, 514, 108 S.Ct. 1355 (1988). As we characterized this case in Christie I:
The Court concluded this result did not run afoul [of] the Tenth Amendment because it did not seek to control or influence the manner in which States regulate private parties but was simply an inevitable consequence of regulating a state activity. In subsequent cases, the Court explained that the regulation in Baker was permissible because it simply subjected a State to the same legislation applicable to private parties.
Christie I, 730 F.3d at 228 (internal quotation marks and citations omitted). Later, in Reno v. Condon, the Court upheld the constitutionality of a law that prohibited states from releasing information gathered by state departments of motor vehicles. The Court ultimately concluded that the law at issue “d[id] not require the States in their sovereign capacity to regulate their own citizens!,] • • • d[id] hot require the [State] Legislature^] to enact any laws or regulations, and it d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals.” Reno, 528 U.S. at 151, 120 S.Ct. 666 (as altered in Christie I, 730 F.3d at 228).
As noted above, the Supreme Court has invalidated laws on anti-commandeering grounds on only two occasions. In New York, the Supreme Court struck down a “take-title” provision whereby states were required to take title to radioactive waste by a specific date, at the waste generator’s request, if they did not adopt a federal program. As we stated in Christie I, the provision “compelled] the states to either enact a regulatory program, or expend resources in taking title to the waste.” Christie I, 730 F.3d at 229. The Supreme Court ultimately concluded in New York that the take-title provision “crossed the line distinguishing encouragement from coercion.” 505 U.S. at 175, 112 S.Ct. 2408. Similarly in Printz v. United States, the Supreme Court concluded that Congress “may neither issue directives requiring the States to address particular problems, nor command the States’ officers ... to administer or enforce a federal regulatory program.” 521 U.S. at 935, 117 S.Ct. 2365 (finding a federal law requiring state officers to conduct background checks on prospective gun owners to commandeer the states in violation of the Tenth Amendment).

2. PASPA Does Not Violate Anti-Commandeering Principles

We continue to view PASPA’s prohibition as more akin to those laws *401 upheld in Hodel, F.E.R.C., Baker, and Reno, and distinguishable from those struck down by the Supreme Court in New York and Printz. Our articulation of the way in which PASPA does not violate anti-commandeering principles warrants refinement, however, given the way in which the 2014 Law attempted to skirt PASPA and the thrust of Appellants’ arguments in this appeal.
In an attempt to reopen the anti-commandeering question we previously decided, Appellants creatively rely on certain language that was used in Christie I. In pressing for a declaration that PASPA unconstitutionally commandeered the states in Christie I, Appellants characterized PASPA as requiring the states to affirmatively keep a prohibition against sports wagering on their books, lest they be found to have authorized sports gambling by law by repealing the prohibition. In response, we opined that Appellants’ position “rest[ed] on a false equivalence between repeal and authorization,” implying that a repeal is not an authorization. 730 F.3d at 233. Before us now Appellants urge that “[t]his Court held [in Christie /] that PASPA is constitutional precisely because it permits States to elect not to prohibit sports wagering, even if affirmatively authorizing it would be unlawful.” Appellants’ Br. 22 (emphasis in original). Appellants are saying, in effect, <cWe told you so” — if the legislature cannot repeal New Jersey’s prohibition as it attempted to do in the 2014 Law, then it is required to affirmatively keep the prohibition on the books, and PASPA unconstitutionally commandeers the states. We reject this argument.
That said, we view our discussion .in Christie I regarding the relationship between a “repeal” and an “authorization” to have been too facile. While we considered whether repeal and authorization are interchangeable, our decision did not rest on that discussion. Today, we. choose to excise that discussion from our prior opinion as unnecessary dicta. To be clear, a state’s decision to selectively remove a prohibition on sports wagering in a manner that permissively channels wagering activity to particular locations or operators is, in essence, “authorization” under PASPA. However, our determination that such a selective repeal of certain prohibitions amounts to authorization under PASPA does not mean that states are not afforded sufficient room under PASPA to craft their own policies.
Appellants urge that our conclusion in Christie I that PASPA does not unconstitutionally commandeer the states rested on our view that PASPA allows states to “choos[e] among many different potential policies on sports wagering that do not include licensing or affirmative authorization by the State.” Appellants’ Br. 29. This is correct. PASPA does not command states to take affirmative actions, and it does not present a coercive binary choice. Our reasoning in Christie I that PASPA does not commandeer the states remains unshaken. ,
Appellants characterize the 2014 Law as a lawful exercise in the space PASPA affords states to create their own policy. They argue that without options beyond a complete repeal or a complete ban on sports wagering, such as the partial repeal New Jersey pursued, PASPA runs afoul of anti-commandeering principles. This argument sweeps too broadly. That a specific partial repeal which New Jersey chose to pursue in its 2014 Law is not valid under PASPA does not preclude the possibility that other options may pass muster. The issue of the extent to which a given repeal would constitute an authorization, in a vacuum, is not before us, as it was not specifically before us in Christie I. However, as *402 the Leagues noted at oral argument before the en banc court, not all partial repeals are created equal. For instance, a state’s partial repeal of a sports wagering ban to allow de minimis wagers between friends and family would not have nearly the type of authorizing effect that we find in the 2014 Law. We need not, however, articulate a line whereby a partial repeal of a sports wagering ban amounts to an authorization under PASPA, if indeed such a line could be drawn. It is sufficient to conclude that the 2014 Law overstepped it.
Appellants seize on the District Court’s erroneous interpretation of Christie I’s anti-commandeering analysis — namely, that PASPA presents states with a strict binary choice between total repeal and keeping a complete ban on their books — to once again urge that if PASPA commands such a choice, then it is comparable to the challenged law in New York. First, unlike the take-title provision included in the statute at issue in New York, PASPA’s text does not present states with a coercive choice to adopt a federal program. To interpret PASPA to require such a coercive choice is to read something into the statute that simply is not there.
Second, PASPA is further distinguishable from the law at issue in New York because it does not require states to take any action. In New York, the Supreme Court held that a federal law that required states to enact a federal regulatory program or take title to radioactive waste at the behest of generators “crossed the line distinguishing encouragement from coercion.” 505 U.S. at 175, 112 S.Ct. 2408. Unlike the law at issue in New York, PAS-PA includes no coercive direction by the federal government. As we previously concluded in Christie I, PASPA does not command states to take any affirmative steps:
PASPA does not require or coerce the states to lift a finger — they are not required to pass laws, to take title to anything, to conduct background checks, to expend any funds, or to in any way enforce federal law. They are not even required, like the states were in F.E.R.C., to expend resources considering federal regulatory regimes, let alone to adopt them. Simply put, we discern in PASPA no directives requiring the States to address particular problems and no commands to the States’ officers to administer or enforce a federal regulatory program.
730 F.3d at 231 (internal quotation marks and alterations omitted) (emphasis in original). Put simply, PASPA does not impose a coercive either-or requirement or affirmative command.
We will not allow Appellants to bootstrap already decided questions of PAS-PA’s constitutionality onto our determination that the 2014 Law violates PASPA. We reject the notion that PASPA presents states with a coercive binary choice or affirmative command and conclude, as we did in Christie I, that it does not unconstitutionally commandeer the states.
IV. Conclusion
The 2014 Law violates PASPA because it authorizes by law sports gambling. We continue to find PASPA constitutional. We will affirm.

. The sports leagues were the National Collegiate Athletic Association, National Football League, National Basketball Association, National Hockey League, and the Office of the Commissioner of Baseball, doing business as Major League Baseball (collectively, the "Leagues”).

. The Leagues named as defendants Christopher J. Christie, the Governor of the State of New Jersey; David L. Roebuck, the Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey; and Frank Zan-zuccki, Executive Director of the New Jersey Racing Commission. The New Jersey Thoroughbred Horsemen’s Association, Inc. ("NJTHA”) intervened as a defendant, as did Stephen M. Sweeney, President of the New Jersey Senate, and Sheila Y. Oliver, Speaker of the New Jersey General Assembly ("State Legislators”). We collectively refer to these parties as the “New Jersey Parties.” In the present case, the New Jersey Parties are the same, with some exceptions. NJTHA was named as a defendant (i.e., it did not intervene), as was the New Jersey Sports and Exposition Authority; the latter is not participating in this appeal. Additionally, Vincent Prieto, not Sheila Y. Oliver, is now the Speaker of the General Assembly.

. In the District Court, the New Jersey Enjoined Parties urged that the Eleventh Amendment gave them immunity such that they could not be sued in an action challenging the 2014 Law. The District Court rejected this argument, as do we, and we note that, while the issue was briefed, the New Jersey Enjoined Parties did not press — or even mention — this issue at oral argument before either the merits panel or the en banc court. They contend that, because the 2014 Law is a self-executing repeal that requires no action from them or any other state official, they are immune from suit. This argument fails. The New Jersey Enjoined Parties are subject to suit under the Ex parte Young exception to Eleventh Amendment immunity, which "permitís] the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' " Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting Ex parte Young, 209 U.S. 123, 160, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). The contrary argument of the New Jersey Enjoined Parties relies on a false premise that execution of the 2014 Law involves no affirmative ultra vires act by state officials. But the 2014 Law is far from passive. As we conclude at length, the 2014 Law establishes a regulatory regime that authorizes wagering on sports in limited locations for particular persons, so it is an affirmative act by New Jersey state officials to authorize by law sports betting, in violation of PASPA. As such, implementation of the law falls squarely within the Ex parte Young exception to sovereign immunity because it is “simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because" it is contrary to federal law. 209 U.S. at 159, 28 S.Ct. 441. "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.” Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal quotation marks and alterations omitted). That is precisely the situation we face in this case. We therefore need *395 not address the unsettled question of whether an Ex parte Young exception must exist in the case of a truly self-executing law because the 2014 Law is not one.

. "We review a district court’s grant of summary judgment de novo.... ” Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413 (3d Cir. 2011). “We review a district court’s grant of a permanent injunction for abuse of discretion.” Meyer v. CUNA Mut. Ins. Soc’y, 648 F.3d 154, 162 (3d Cir. 2011).

. We cite the version of Black’s Law Dictionary that was current in 1992, the year PAS-PA was passed.

. Granted, the 2014 Law applies to horse racetracks as well as casinos, while the PAS-PA exception for New Jersey refers only to casinos, but that does not change the signifi-canee of the New Jersey exception because it refers to gambling in places that already allow gambling, and the racetracks fall within that rubric.

. Because we conclude that the 2014 Law authorizes by law sports gambling, we need not address the argument made by Appellees and Amicus that the 2014 Law also licenses sports gambling by permitting only those entities that already have gambling licenses or recently had such licenses to conduct sports gambling operations. We also reject the argument of the State Legislators and the NJTHA that, to the extent that any aspect of the 2014 Law violates PASPA, we should apply the 2014 Law’s severability clause. Citing the broadly-worded severability provision of N.J. Stat. Ann. § 5:12Ar-9, they argue that the District Court should have saved the 2014 Law by severing the most objectionable parts. For example, the NJTHA urges that, "if the Court ... concludes that a state decision to prohibit persons under 21 from making sports bets is [an] authorization by law for that activity by persons over 21, the age limitation could be severed, leaving it to the sports gambling operators ... to impose a reasonable age limit.” NJTHA’s Reply Br. at 23. It also argues that, "if the Court concludes that a state decision to prohibit ... sports betting on some games is [an] authorization by law as to betting on all other games, this limitation could be severed,” and that "the Court can sever the Law’s provision dealing with casinos from its provision dealing with racetracks.” Id. at 24. Lifting the age limitation, permitting betting on New Jersey schools' games, or limiting the authorization to an even narrower category of venues, however, would not alter our conclusion that the 2014 Law authorizes by law sports betting. "The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.” Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (internal quotation marks omitted). Because New Jersey’s legislature, in both the 2012 Law and the 2014 Law, was loath to permit sports betting outside of gambling establishments, we cannot reasonably say that it would have enacted a repeal of its gambling laws without the age restriction, without the restriction on gambling on New Jersey-based college sports, and without the geographic restriction to casinos and racetracks. We thus need not speculate about other possible forms that severance might take.