**PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

No. 18-3550

_____

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association; NATIONAL BASKETBALL
ASSOCIATION, a joint venture; NATIONAL FOOTBALL
LEAGUE, an unincorporated association; NATIONAL
HOCKEY LEAGUE, an unincorporated association; OFFICE
OF THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business as MAJOR
LEAGUE BASEBALL

v.

GOVERNOR OF THE STATE OF NEW JERSEY; DAVID
L. REBUCK, Director of the New Jersey Division of Gaming
Enforcement and Assistant Attorney General of the
State of New Jersey; *JUDITH A. NASON, Acting Executive
Director of the New Jersey Racing Commission; NEW
JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC.; NEW JERSEY SPORTS &
EXPOSITION AUTHORITY STEPHEN M. SWEENEY,
President of the New Jersey Senate; *CRAIG J. COUGHLIN,
Speaker of the New Jersey Assembly

(Intervenors in District Court)

New Jersey Thoroughbred Horsemen's Association, Inc.,
Appellant

*(Amended pursuant to Clerk's Order dated 12/27/18)

<hr />

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.: 3-14-cv-06450)
District Court Judge: Honorable Michael A. Shipp

<hr />

Argued on July 2, 2019

Before: McKEE, PORTER and RENDELL, <u>Circuit Judges</u>

(Opinion filed September 24, 2019)

Anthony J. Dreyer
Jeffrey A Mishkin **(Argued)**
Skadden Arps Slate Meagher & Flom
4 Times Square
New York, NY 10036

Richard Hernandez
William J . O'Shaughnessy
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102

Counsel for Appellees

Eliott M. Berman
McElroy Deutsch Mulvaney & Carpenter
570 Broad Street
Suite 1500
Newark, NJ   07102

Ronald J. Riccio **(Argued)**
McElroy Deutsch Mulvaney & Carpenter
1300 Mount Kemble Avenue
P. O. box 2075
Morristown, NJ   07962

Counsel for Appellants

O P I N I O N

**RENDELL**, Circuit Judge:

Temporary restraining orders are not always a sure bet. Federal Rule of Civil Procedure 65(c) requires the party seeking a TRO to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In this case, Appellees moved for, and the District Court entered, a TRO that, among other things, barred the New Jersey Thoroughbred Horsemen's Association ("NJTHA") from conducting sports gambling on the basis that New Jersey's "authorization" of sports gambling violated the federal

Professional and Amateur Sports Protection Act ("PASPA"), and required Appellees to post a bond as security. On appeal, NJTHA and the other defendants successfully challenged the constitutionality of PASPA in the Supreme Court, and, on remand, NJTHA sought to recover on the bond that Appellees had posted. The District Court denied the motion for judgment on the bond. Because we conclude that NJTHA was "wrongfully enjoined" within the meaning of Rule 65(c) and no good cause existed to deny bond damages in this case, we will vacate and remand.

I.

Although this appeal concerns NJTHA's ability to recover on the bond, that is only the last shoe to drop in a lengthy saga that involves other overarching issues, including the constitutionality of PASPA, its interaction with New Jersey's attempts to legalize sports gambling, and the several opinions of the District Court, this Court, and the Supreme Court in the two actions litigating these issues among the same parties. Thus, a thorough review of the unique procedural history underlying this dispute is warranted.

A.

In 1992, Congress enacted PASPA, making it "unlawful" for "a government entity" or a person acting at the direction of a government entity "to sponsor, operate, advertise, promote, license, *or authorize by law* or compact . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on" competitive sporting events. 28 U.S.C. § 3702 (emphasis added). At that time and for the following nineteen years, New Jersey law paralleled PASPA,

4

prohibiting sports gambling by its Constitution and by statute. *See, e.g.*, N.J. Const. art. IV, § 7, para. 2; N.J. Stat. Ann. § 2C:37–2; N.J. Stat. Ann. § 2A:40–1. However, in 2011, New Jersey constituents voted to amend the state's Constitution to allow the legislature to authorize sports gambling, N.J. Const. art. IV, § 7, para. 2(D), (F), and the legislature did so by enacting the Sports Wagering Act in 2012 (the "2012 Act"), N.J. Stat. Ann. §§ 5:12A–1 *et seq.*

The National Collegiate Athletic Association and four professional sports leagues[1] (collectively, "Appellees" or "the Leagues"), initiated an action in federal court ("*Christie I*") against the New Jersey Governor and other state officials (collectively, the "State Defendants"), seeking to enjoin the 2012 Act as violative of PASPA and arguing that they would be irreparably injured unless an injunction was issued. Because it intended to offer sports gambling at Monmouth Park racetrack, NJTHA intervened.[2] The defendants did not dispute that the 2012 Act violated PASPA and instead argued, among other things, that PASPA unconstitutionally commandeered the states' sovereign authority. The District Court disagreed, held that PASPA was constitutional, and enjoined the implementation of the 2012 Act. *See Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 573, 578–79 (D.N.J. 2013). We affirmed, reasoning that PASPA does not affirmatively command the states to act and consequently did

---

[1] The professional sports leagues are the National Basketball Association; the National Football League; the National Hockey League; and the Office of the Commissioner of Baseball, doing business as Major League Baseball.

[2] Stephen M. Sweeney, President of the New Jersey Senate, and Sheila Y. Oliver, then Speaker of the New Jersey General Assembly, also intervened.

not prohibit them from repealing any existing bans on sports wagering. *See Nat'l Collegiate Athletic Ass'n v. Christie*, 730 F.3d 208, 231–32 (2013). The Supreme Court denied certiorari. *Christie v. Nat'l Collegiate Athletic Ass'n*, 537 U.S. 931 (2014).

## B.

In response to our reasoning that PASPA does not prohibit states from repealing any existing bans on sports gambling, the New Jersey legislature enacted a law repealing certain state law provisions that prohibited gambling at horserace tracks and casinos (the "2014 Act"). *See* 2014 N.J. Sess. Law Serv. Ch. 62 (codified at N.J. Stat. Ann. §§ 5:12A-7 to -9 (repealed 2018)). NJTHA immediately announced its intention to conduct sports gambling at Monmouth Park. Appellees filed the instant suit ("*Christie II*") and, at the outset, requested a TRO and preliminary injunction to enjoin NJTHA from doing so, again asserting irreparable injury. Appellees also asked the District Court to restrain the State Defendants from implementing the 2014 Act and to enforce the injunction entered in *Christie I*. They filed their request on both the *Christie I* and *Christie II* dockets.

In response, the defendants relied on our reasoning in *Christie I* that the federal law allowed a repeal of state sports gambling prohibitions. The State Defendants specifically asserted that a grant of Appellees' request would again raise the issue of PASPA's constitutionality. *See* A. 240–41 ("[E]ither PASPA permits States to repeal their prohibitions against sports wagering in whole or in part, as does the 2014 Act, or PASPA unconstitutionally commandeers states['] authority by forcing States to maintain unwanted

6

prohibitions."). Additionally, NJTHA argued, among other things, that the Leagues' assertion that sports gambling would harm them was false, since they "support, participate in, and significantly profit from betting on the outcomes of their games as well as the performances of the players in their games." Br. in Opp'n to Pls.' Appl. for a TRO at 35, *Nat'l Collegiate Athletic Ass'n v. Christie*, No. 3:14-cv-06450 (D.N.J. Oct. 24, 2014), ECF No. 21. NJTHA also complained that the Leagues had not posted a bond, as required by Federal Rule of Civil Procedure 65, and attached a certification asserting that they would lose $1,170,219 per week if a TRO was granted.[3]

The District Court granted the requested TRO and, in doing so, relied on our holding in *Christie I* that PASPA is constitutional. The Court ordered Appellees to post a $1.7 million bond, which it believed was "on the high side to avoid any potential loss to defendants." A. 64. Shortly thereafter, it extended the TRO for an additional two weeks and increased the bond amount to a total of $3.4 million.

Just before the TRO was set to expire, the District Court converted the scheduled hearing on the Leagues' request for a preliminary injunction into a final summary judgment hearing. The Court granted summary judgment to Appellees, holding that the 2014 Act was "invalid as preempted by PASPA." *Nat'l Collegiate Athletic Ass'n v. Christie*, 61 F. Supp. 3d 488, 506 (D.N.J. 2014). It also entered a permanent injunction against the State Defendants, enjoining them "from violating PASPA

---

[3] Appellees did not contest this amount and instead argued that they should not be required to put up a bond.

7

through giving operation or effect to the 2014 [Act] in its entirety."[4]  *Id.*

On appeal, this Court first affirmed the District Court's order.  *See Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 799 F.3d 259, 261 (3d Cir. 2015).  We then granted NJTHA's petition for rehearing *en banc* and again affirmed the grant of summary judgment.  *See Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 832 F.3d 389, 392 (3d Cir. 2016) (en banc).  In doing so, we determined that the 2014 Act, like its predecessor, "authorize[d]" sports gambling in violation of PASPA.  *Id.* at 396.  We explicitly rejected our reasoning in *Christie I* that a repeal is not an "affirmative authorization."  *Id.* at 396–97.  Instead, we looked to "what the provision actually does" and held that, "[w]hile artfully couched in terms of a repealer, the 2014 [Act] essentially provides that, notwithstanding any other prohibition by law, casinos and racetracks shall hereafter be permitted to have sports gambling," which "is an authorization."  *Id.* at 397.  We then went on to again reiterate PASPA's constitutionality.  *Id.* at 399.

The Supreme Court granted certiorari and reversed our *en banc* judgment.  *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1485 (2018).  Although the Court agreed with one aspect of our ruling, namely, that a repeal of a law banning an activity constitutes an "authoriz[ation]" of that activity, *id.* at 1474, the Court concluded that PASPA's prohibition of sports gambling violated the Constitution's anticommandeering principle because "state legislatures are [still] put under the direct control of Congress," *id.* at 1478.

---

[4] The District Court did not permanently enjoin NJTHA.

C.

After prevailing in the Supreme Court, NJTHA filed a motion in the District Court for judgment on the bond.[5] The Court ordered briefing on whether NJTHA was "wrongfully enjoined," whether NJTHA was entitled to recover the full bond amount as a matter of law without proving actual loss, and whether NJTHA's claim for damages greater than the bond amount could be decided as a matter of law. There was no discovery on the actual loss amount.

The District Court denied NJTHA's motion. First, it determined that NJTHA was not "wrongfully enjoined" per Federal Rule of Civil Procedure 65(c). The Court thought that "NJTHA's contention that it is entitled to damages under the injunction bond conflate[d] the issue of whether the 2014 [Act] authorized sports betting with the Supreme Court's ultimate holding that PASPA is unconstitutional." A. 18. The District Court narrowly characterized the issue before it at the TRO stage as "whether the 2014 [Act] . . . effectively authorized sports betting in violation of PASPA" and noted that both the Third Circuit and the Supreme Court agreed with its conclusion that the 2014 Act did so. A. 16 (citation and internal quotation marks omitted). The Court stated, "That PASPA's constitutionality was introduced on appeal does not convert the bond, which assured that the 2014 [Act] amounted to an

_____

[5] NJTHA also sought interest and damages for the post-TRO period (from the District Court's grant of summary judgment through the Supreme Court's judgment), the latter of which was for Appellees' "bad faith by wrongfully blocking the NJTHA from operating a sports betting venue." A. 355.

9

authorization, into a bond that assured any and all possibilities." A. 19.

The District Court also held that, even if NJTHA had been wrongfully enjoined, good cause existed to deny NJTHA's motion. In doing so, the Court relied on *Coyne-Delany Co. v. Capital Development Board*, in which the Seventh Circuit held that "a prevailing defendant is entitled to damages on the injunction bond unless there is a good reason for not requiring the plaintiff to pay in the particular case" and listed factors to be considered in determining whether good reason exists. 717 F.2d 385, 391–392 (7th Cir. 1983). The District Court considered one factor that had been relied upon by the Court in *Coyne*, namely, a change in the law. The District Court here reasoned that the law in this case had changed, characterizing PASPA as "constitutionally valid" in 2014, when the TRO was entered, and invalid in 2018. A. 20. NJTHA timely appealed the District Court's order.

On appeal, NJTHA urges that the District Court was wrong on both counts. Specifically, NJTHA argues that the Court erred in holding that it was not "wrongfully enjoined" because (1) entry of the TRO was premised on the constitutionality of PASPA, which the Supreme Court ultimately held was unconstitutional, and (2) the District Court incorrectly considered the law at the time it entered the TRO, as opposed to the law at the time of the Supreme Court's final judgment, in making that determination. NJTHA also urges that the District Court erred by exercising its discretion to deny bond damages and in concluding that there was good cause to do so. On this front, NJTHA claims that discretion to deny bond damages under Rule 65(c) does not exist and the Seventh

10

Circuit case relied upon by the District Court is not controlling.[6]

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. Because NJTHA challenges the District Court's interpretation of Federal Rule of Civil Procedure 65(c), we review the District Court's order *de novo*. *Garza v. Citigroup, Inc.*, 881 F.3d 277, 280 (3d Cir. 2018).

## III.

Federal Rule of Civil Procedure 65(c) states, in relevant part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

---

[6] NJTHA also argues that it is entitled to automatic recovery of the bond amount and excess damages for Appellees' bad faith. Because these issues were not addressed by the District Court, we will not consider them.

The Rule itself only implies "that when a party has been wrongfully enjoined, it may collect some or all of the security." *Global Naps, Inc. v. Verizon New England, Inc.*, 489 F.3d 13, 20 (1st Cir. 2007). It does not explicitly address when an enjoined party may recover on a bond, nor does it indicate whether and to what extent a district court has discretion to deny damages. Although these issues have been considered by a number of other circuits, they are matters of first impression in our Court.

A.

We first consider the meaning of "wrongfully enjoined" and whether NJTHA was wrongfully enjoined by the TRO issued in *Christie II*. We join the other circuits that have explicitly interpreted this term and hold that a party is wrongfully enjoined when it turns out that that party had a right all along to do what it was enjoined from doing. *See Global Naps*, 489 F.3d at 22 ("[A] party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing."); *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1059 (8th Cir. 2006) ("[A] party has been wrongfully enjoined if it is ultimately found that the enjoined party had at all times the right to do what it was enjoined from doing."); *Nintendo of Am. v. Lewis Galoob Toys*, 16 F.3d 1032, 1036 (9th Cir. 1994) ("[A] party has been wrongfully enjoined within the meaning of Rule 65(c) when it turns out the party enjoined had the right all along to do what it was enjoined from doing."); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir. 1990) (stating that a party has been wrongfully enjoined when the "party had at all times the right to do the enjoined act").

12

The parties disagree on the application of this standard to the case at hand. NJTHA urges that, because the Supreme Court ultimately held that PASPA is unconstitutional, it "turned out" that it had a right all along to conduct sports gambling and was, therefore, "wrongfully enjoined." Appellees disagree, claiming that we should consider both the state of the law and the specific issue before the District Court *at the time the TRO was granted*. They argue that because "the constitutionality of PASPA was settled law in this Circuit" at the time the TRO was entered and because the District Court's holding on the only issue before it at that time (i.e., that the 2014 Act "authorized" sports gambling) was confirmed by this Court and the Supreme Court, NJTHA was not "wrongfully enjoined." Br. for Appellees at 20. Appellees also urge that a determination that NJTHA was wrongfully restrained would require us to apply the Supreme Court's holding retroactively.

Appellees' arguments are flawed for three reasons. First, Appellees read the procedural history, as the District Court did, a bit too narrowly. One might ask, if *Christie II* involved only the discrete issue of "authorization" and had nothing to do with the constitutionality of PASPA, how could the Supreme Court, in granting certiorari from *Christie II* (after having denied it from *Christie I*), address the issue of the constitutionality of PASPA and declare it unconstitutional? The answer is: because the constitutionality of PASPA was inexorably intertwined with the issues in *Christie II*. Indeed, the State Defendants specifically urged that "either PASPA permits States to repeal their prohibitions against sports wagering in whole or in part, as does the 2014 Act, or PASPA unconstitutionally commandeers states['] authority by forcing States to maintain unwanted prohibitions." And we addressed the issue of PASPA's constitutionality in *Christie II* in much

13

more than cursory fashion, although noting that it had been specifically ruled upon in *Christie I*. Even though the case before the Supreme Court emanated from two discrete actions, the Supreme Court clearly considered the cases to be the proverbial "whole ball of wax." That the District Court parsed the issues based upon the limited nature of the subject matter it believed it addressed in the TRO order does not control the fact that the constitutionality of PASPA was imbedded in that subject matter by virtue of our opinion in *Christie I*.[7]

---

[7] Our disagreement with the dissent stems from the nature of the issues raised in the unusual procedural setting of the *Christie* cases, and our differing views as to how narrowly we parse what was before the District Court when it entered the TRO.

*Christie I* was all about the constitutional implications of removing prohibitions, versus "affirmatively authorizing"; the latter constituting problematic commandeering. In opposing the TRO, the State Defendants called on the "definitive" holding in *Christie I*, quoting from our opinion: "the lack of an affirmative prohibition of an activity does not mean it is *affirmatively* authorized by law." A. 239 (quoting *Christie I*, 730 F.3d at 232). At the same time they maintained their fallback position noted above, that if the legislation "authorized," then PASPA unconstitutionally commandeers.

Thus, "authorizing" was not a discrete issue but, rather, one with weighty constitutional baggage. The District Court in *Christie II* decided the issue of authorization within, as the District Court noted, the "framework" of *Christie I* and its commandeering analysis.

14

Second, Appellees' view conflates whether NJTHA was "wrongfully enjoined" with whether the District Court abused its discretion in issuing the TRO. In *Sprint Communications Co. v. CAT Communications International, Inc.*, we made clear that "wrongfully enjoined" "does not necessarily [mean] that the district court abused its discretion in granting the relief in the first place."[8] 335 F.3d 235, 242 n.9 (quoting *Blumenthal*, 910 F.2d at 1054) (internal quotation marks omitted) (alteration in original). Instead, as noted above, whether a party is wrongfully enjoined depends upon whether it *turns out* that that party had a right all along to conduct the activity it was enjoined from doing. The entire concept of "wrongfully enjoined" envisions a look back from the ultimate conclusion of the case: Should the enjoined party have been permitted to do what it was prevented from doing? Thus, whether a party was wrongfully enjoined depends upon the final judgment on the merits. *See id.* ("[T]he ultimate determination whether a party was wrongfully enjoined and can recover on the injunction bond generally must wait until 'after a trial and final judgment on the merits.'" (citation omitted)); *see also Global Naps*, 489 F.3d at 23 (stating that whether a party is "wrongfully enjoined" is determined by the final judgment).

Perhaps one could plausibly read Rule 65(c) as asking whether the District Court abused its discretion in granting the TRO. But this would distort the plain meaning and purpose of the rule. First, the rule allows defendants to collect on the bond if they are "*found to have been* wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The use

---

[8] Indeed, in *Nintendo*, the Ninth Circuit had, in an earlier decision, upheld the district court's issuance of the preliminary injunction but, later, ultimately determined that the defendant was wrongfully enjoined. 16 F.3d at 1036 n.4.

15

of a past tense verb phrase—found to have been—is important. *See U.S. v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."). It suggests that we look back at the propriety of the injunction from the vantage point of the conclusion of the litigation, rather than stepping into the shoes of the District Court at the time the injunction was issued. If "wrongfully enjoined" concerned only the propriety of the issuance of an injunction, then Rule 65(c) would explicitly state a requirement that the injunction was improperly entered. But to focus on whether a TRO was wrongfully issued misses the mark. "Wrongfully enjoined" focuses on the right of an enjoined party to engage in certain conduct.[9] For example, imagine that X asks a district court for a TRO against Y. X urges that Y's actions violate a federal law, Statute A. The parties and the district court assume that Y's actions violate the general terms of Statute A—their only focus is on whether Y's conduct fits within a certain exception to Statute A, Exception B. The court rules that Exception B does not apply to Y and issues the TRO. But an appellate court,

---

[9] The dissent urges that the NJTHA was not wrongfully enjoined because the District Court properly issued the TRO under PASPA, four years before the Supreme Court held it unconstitutional. But that is not the relevant question. Rather, it is whether the defendant was wrongfully enjoined given what we know today. We agree with the dissent that the District Court "faithfully followed our precedent." Dissenting Op. at 6. But this is not incompatible with our holding. The District Court can faithfully apply our precedent, and still, when the litigation has reached its conclusion, the defendant may be found to have been wrongfully enjoined. Such is the case here.

much to X and Y's surprise, finds that the district court's discussion of Exception B is irrelevant because Y does not violate the general terms of Statute A. Was Y wrongfully enjoined? Yes. While the district court's reasoning may have been correct, i.e., that Y's conduct does not fit within the terms of Exception B, and the court may have correctly interpreted the legal issue that was pressed by the parties, nevertheless, Y was still wrongfully enjoined, because it turned out that Y had a right to do all along what he was enjoined from doing.

Similarly, in *Nintendo*, the enjoined defendant introduced defenses at trial that it had not asserted at the preliminary injunction stage. 16 F.3d at 1034. The defendant ultimately prevailed. *Id.* That the new defenses were not considered when the TRO was entered but may have affected the final outcome of the case did not preclude a holding that the defendant had been wrongfully enjoined. *See id.* at 1037–38. Similarly, in this case, the fact that the District Court may not have erred in its ruling in entering the TRO in *Christie II* does not speak to whether NJTHA had a right all along to conduct sports gambling.[10] Because a court can only be certain of an enjoined party's rights after a case has been fully litigated, "wrongfully enjoined" can only be determined after a final judgment on the merits.

_____

[10] Nor was the District Court "bound by this Court's holding in *Christie I*" to enter the TRO and summary judgment for Appellees. Br. for Appellees at 9. The District Court might have, instead, seized upon our reasoning that a repeal would not be an authorization in violation of PASPA, as the State Defendants did in enacting the 2014 Act.

17

In their final argument, Appellees assert that accepting NJTHA's argument would require us to retroactively apply the Supreme Court's holding that PASPA is unconstitutional. Indeed, in the mine-run of cases where a statute has been held to be unconstitutional, the issue of its retroactive application to invalidate previous final orders necessarily arises. *See Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374 (1940) (instructing that "[q]uestions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application" be considered when determining whether a new rule applies retroactively). But that body of caselaw, and indeed retroactivity itself, is not implicated when we are asked to determine whether a party was "wrongfully enjoined."[11] Did it turn out that NJTHA had the right all along to do what they were enjoined from doing? There is no way that the answer to that question could be "no." That answer would render the bond provision, indeed the concept of "wrongfully enjoined," entirely meaningless. The lookback that is envisioned in the Rule is not an issue of retroactivity, or applying a ruling to undo or affect previous rulings; instead, it requires a simpler inquiry as to whether, if we knew then what we know now, should NJTHA have been restrained? This does not require the court at the bond hearing to ask, as the dissent seems to urge, whether the TRO was wrongfully issued, or to nullify any

---

[11] The dissent seems to reason that there needed to be a court finding that the NJTHA had been wrongfully enjoined or restrained. Again, that is not an issue to be decided later in the case, but instead, is what the court at the bond hearing must assess, after the case is fully concluded.

18

intervening action as invalid.  *See, e.g.*, Dissenting Op. at 5 n.3.
Here the "full deliberation" urged by the dissent came with the
Supreme Court's consideration of the case as a whole, and its
declaration of PASPA's unconstitutionality.  Because the
answer to that question is "no," the answer to whether it was
wrongfully restrained must be "yes."

Here, PASPA provided the only basis for enjoining
NJTHA from conducting sports gambling, and the Supreme
Court ultimately held that that law is unconstitutional.
Therefore, NJTHA had a right to conduct sports gambling all
along.  We conclude that NJTHA was wrongfully enjoined and
should be able to call on the bond.

B.

We next evaluate whether and to what extent a district
court has discretion to deny bond damages and whether doing
so was proper in this case.  A clear majority of our sister
circuits have held that there is a rebuttable presumption that a
wrongfully enjoined party is entitled to recover provable
damages up to the bond amount.  *See Front Range Equine
Rescue v. Vilsack*, 844 F.3d 1230, 1234 (10th Cir. 2017)
("[W]here there is a finding that a defendant has been
wrongfully enjoined, there is a presumption of recovery and
the district court's discretion to deny damages is limited.");
*Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558–59 (2d
Cir. 2011) ("Although we hold that a wrongfully enjoined
party is entitled to a presumption in favor of recovery, that
party is not automatically entitled to the damages sought.  The
presumption applies to 'provable' damages."); *Global Naps*,
489 F.3d at 23 ("[W]e adopt the majority rule that there is a
rebuttable presumption that a wrongfully enjoined party is

19

entitled to have the security executed so as to recover provable damages up to the amount of the security."); *Nintendo*, 16 F.3d at 1036 ("[W]e join what appears to be the majority and hold there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the bond executed and recover provable damages up to the amount of the bond."); *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 1049 (1993) ("[A] defendant injured by a wrongfully issued preliminary injunction is presumptively entitled to recovery on the injunction bond."); *Coyne*, 717 F.2d at 391 (agreeing with the majority approach that "a prevailing defendant is entitled to damages on the injunction bond unless there is a good reason for not requiring the plaintiff to pay in the particular case"). As noted by many of those courts, this rule is "strongly implied" in Rule 65(c) itself. *Nokia Corp.*, 645 F.3d at 558; *see also Global Naps*, 489 F.3d at 20; *Nat'l Kidney*, 958 F.2d at 1135 (citing *Coyne*, 717 F.2d at 390–91) ("Although the Rule does not explicitly address the disposition of the bond once the injunction is found wrongful, payment to the injured defendant seems almost inescapable, since the Rule imposes a requirement of security for the precise purpose of assuring compensation of the defendant . . . ."). Moreover, the rule increases predictability of the law, *see Coyne*, 717 F.2d at 392, "discourag[es] parties from requesting injunctions based on tenuous legal grounds," *Nintendo*, 16 F.3d at 1037, and conserves judicial resources, since "a defendant who can recover damages against a preliminary injunction bond will be less likely to file a separate malicious prosecution action," *id.* Because the presumption in favor of recovery is rebuttable, the rule still affords courts some discretion to "decline to impose damages on the rare party who has lost a case on the merits but nevertheless should not suffer the execution of the preliminary injunction bond." *Id.*

20

Appellees, however, urge us to adopt the approach espoused by the Fifth Circuit in *H&R Block, Inc. v. McCaslin*, which provides, "The awarding of damages pursuant to an injunction bond rests in the sound discretion of the court's equity jurisdiction." 541 F.2d 1098, 1099 (5th Cir. 1976) (per curiam). But the Fifth Circuit stands alone on this issue,[12] and

---

[12] Appellees cite to *Page Communications Engineers, Inc. v. Froehlke*, 475 F.2d 994, 997 (D.C. Cir. 1973), as additional authority for the minority approach. However, the D.C. Circuit more recently interpreted *Page* as aligning with the majority approach:

> In *Page* we rejected a claim that Rule 65(c) automatically entitled defendants to recovery on the bond on a showing of damage, regardless of the equities of the case. We clearly regarded those equities as leaning toward the plaintiff; although we spoke loosely of the plaintiff's "good faith", arguably suggesting that that was enough to negate recovery on the bond, we also noted that the injunction might never have been granted if the government defendant had brought a specific study to the court's attention in a timely fashion. Accordingly, we do not read Page as adopting a maverick view but rather as in

21

the viability of that ruling has since been called into question by a more recent opinion. *See Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989) (stating that Rule 65(c)'s requirement of a bond "assures the enjoined party that it may *readily* collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured" (emphasis added) (citing *Coyne*, 717 F.2d at 391)). Because the majority approach is implied in the language of Rule 65(c) and promotes its goals, we now adopt that rule.

Although it relied on *Coyne* in its analysis on this issue, the District Court failed to apply the presumption in favor of recovery that the Court in *Coyne* applied. Nor did the District Court note the main thrust of the Seventh Circuit's reasoning in that case, namely, that a district court is required to "consider and evaluate the full range of factors . . . that would be relevant under the proper standard." *Coyne*, 717 F.2d at 392. These include, but are not limited to, a defendant's failure to mitigate damages, *Nokia Corp.*, 645 F.3d at 559, the reasonableness of the damages sought, *id.*, the outcome of the underlying suit, *Coyne*, 717 F.2d at 392, and the parties' resources, *id.*[13] Only

accord with the accepted presumption in favor of recovery.

*Nat'l Kidney*, 958 F.2d at 1134 (citations omitted), *cert. denied*, 506 U.S. 1049 (1993).

[13] Appellees claim that we should also consider their good faith in requesting the TRO. However, this is not a factor properly considered in the good cause analysis because "[g]ood faith in the maintenance of litigation is . . . expected of all litigants"

22

after listing and discussing these factors did the Court in *Coyne* reference the factor relied upon by the District Court here to deny damages, namely, a change in the law. *See id.* at 392. The Court there stated, "We do not believe that a change in the law is always a good ground for denying costs and injunction damages to a prevailing party, but it is a legitimate consideration, perhaps especially where the prevailing party is a state agency that benefited from a change in the law of its state." *Id.* at 392–93.

None of the factors cited in *Coyne* rebut the presumption that NJTHA is entitled to recover bond damages in this case. Appellees have not claimed that NJTHA has failed to mitigate its damages or that the bond amount is unreasonable,[14] and the underlying suit resulted in a judgment in NJTHA's favor. And, as to a change in the law, this case does not involve the type of "change in law" contemplated by *Coyne*. There, the district court, in issuing the preliminary injunction, had relied on an intermediate state appellate court decision holding that an indirect bidder had a property right in being allowed to bid on a public contract. *See Coyne*, 717 F.2d at 389. While the suit was pending, the state Supreme Court

_____

and, otherwise, the presumption in favor of awarding bond damages would "congeal[] virtually into a rock." *Nintendo*, 16 F.3d at 1037 (quoting *Nat'l Kidney*, 958 F.2d at 1135) (internal quotation marks omitted); *see also Coyne*, 717 F.2d at 392 (stating that good faith would be a sufficient reason to deny bond damages "only if the presumption were against rather than in favor of awarding costs and damages on the bond to the prevailing party").

[14] In fact, the bond amount was set well below what NJTHA had requested.

23

reversed course and held that no such property right existed. *See id.* Here, there was no change in the state of the law while the case was in the federal court. Instead, the defendants in this case successfully challenged the constitutionality of PASPA on appeal, such that they ultimately prevailed. That is not a change in the law; that is success on the merits. Accordingly, we conclude that NJTHA is entitled to recover provable damages up to the bond amount.

## IV.

We will vacate the denial of NJTHA's motion for judgment on the bond and damages, and remand for the District Court to determine the amount to be collected.[15]

---

[15] On remand, NJTHA will have the burden of showing provable damages. *Virginia Plastics Co. v. Biostim Inc.*, 820 F.2d 76, 80 n.6 (3d Cir. 1987). Although it is not required to prove an amount "to a mathematical certainty," *Global Naps*, 489 F.3d at 23–25, it must establish what damages were proximately caused by the erroneously issued injunction . . . and the alleged damages cannot be speculative," *Virginia Plastics Co.*, 820 F.2d at 80 n.6.

24

PORTER, *Circuit Judge*, dissenting.

I disagree with the majority's holding that the New Jersey Thoroughbred Horsemen's Association ("NJTHA") was wrongfully enjoined for two reasons. First, the Supreme Court invalidated the Professional and Amateur Sports Protection Act ("PASPA") on constitutional grounds, but the temporary restraining order was not based on PASPA's constitutionality. Instead, the District Court considered whether New Jersey law complied with PASPA itself. And even in striking down PASPA, the Supreme Court agreed with the District Court on that statutory question. Second, I disagree that the Supreme Court's decision holding PASPA unconstitutional necessarily means that the NJTHA was wrongfully enjoined under the PASPA-based TRO issued four years earlier. This holding requires indulging the fiction—not available to the District Court that issued the TRO—that PASPA never existed at all.

I

There were two proceedings involving these parties. The first one, *Christie I*, involved a straight-on constitutional challenge. The second one, *Christie II*, presented a much narrower statutory question. The majority ably recites this procedural history, but the different issues involved in the two proceedings deserve highlighting.

*Christie I* started when the major professional sports leagues (collectively, the "Leagues") banded together to oppose a 2012 New Jersey law allowing sports betting at horse racetracks and casinos. The Leagues argued that the law violated PASPA. In response, the defendants directly challenged "PASPA's constitutionality; specifically, whether it violated the Commerce Clause, the Tenth Amendment, the Due Process Clause and related Equal Protection principles, or the Equal Footing Doctrine." *Nat'l Collegiate Athletic Ass'n v. Christie*, No. CV146450MASLHG, 2018 WL 6026816, at *1 (D.N.J. Nov. 16, 2018). In early 2013, the district court denied the defendants' constitutional challenge. 926 F. Supp. 2d 551, 579 (D.N.J.). It upheld PASPA and permanently enjoined New Jersey officials from enforcing the 2012 law. *Id.* We affirmed and the Supreme Court denied certiorari. 730 F.3d 208, 215 (3d Cir. 2013); 573 U.S. 931 (2014).

1

The second proceeding—*Christie II*—started in 2014, when New Jersey enacted a revised law to repeal restrictions on gambling. Soon after the 2014 law passed, the Leagues again sued, seeking to enjoin implementation of the 2014 law. The District Court granted the Leagues' TRO request but required them to post a security bond under Rule 65(c) of the Federal Rules of Civil Procedure. The bond was originally set at $1.7 million, and after the TRO was extended another two weeks, was increased to $3.4 million.

In November 2014—after the TRO had been in place for 28 days—the District Court granted summary judgment for the Leagues. 61 F. Supp. 3d 488, 491 (D.N.J. 2014). Properly applying our *Christie I* decision, it held that the 2014 law authorized sports betting, which violated PASPA. *Id.* at 505. The District Court rejected the characterization of the 2014 law as a more limited, permissible successor:

> While styled as a *partial repeal*, the 2014 Law would have the same primary effect of the 2012 Law—allowing sports wagering in New Jersey's casinos and racetracks for individuals age twenty-one and over but not on college sporting events that take place in New Jersey or on New Jersey college teams. This necessarily results in sports wagering with the State's imprimatur, which goes against the very goal of PASPA—to ban sports wagering pursuant to a state scheme.

*Id.*

Once again, the District Court's decision was appealed, and once again, we affirmed in a panel decision. 799 F.3d 259 (3d Cir. 2015). We re-heard the case en banc and once more affirmed the District Court. We explained that although the 2014 law was "artfully couched in terms of a repealer," it "essentially" legalized gambling. 832 F.3d 389, 397 (3d Cir. 2016) (en banc). Under PASPA, "[t]his is an authorization." *Id.*

The losing parties, including the NJTHA, again sought review from the Supreme Court. This time, they got it. In May 2018, the Supreme Court held that PASPA unconstitutionally commandeered state legislatures, violating the Tenth

Amendment. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018). But the Supreme Court agreed with the District Court (and this Court) on the issue litigated in *Christie II*: "[w]hen a State completely or partially repeals old laws banning sports gambling, it 'authorize[s]' that activity." *Id*. at 1474 (alteration original).

In the wake of *Murphy*, the NJTHA asked the District Court to award it the $3.4 million bond. The NJTHA argued that the Supreme Court's holding that PASPA was unconstitutional meant that the NJTHA was wrongfully enjoined for 28 days in late 2014. The District Court rejected this request and the NJTHA appealed.

II

Under Rule 65(c), a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The purpose of this provision is to enable a restrained or enjoined party to secure indemnification for any costs … and any damages that are sustained during the period in which a wrongfully issued equitable order remains in effect." Charles A. Wright & Arthur R. Miller, 11A *Federal Practice & Procedure: Civil*, § 2954 (3d ed.).

The majority opinion aligns our Court with others that have interpreted Rule 65(c) to "hold that a party is wrongfully enjoined when it turns out that that party had a right all along to do what it was enjoined from doing." Maj. Op. 13 (collecting cases). I agree that this is the correct standard, but I disagree with its application here. In the sister circuit cases cited by the majority, the injunction and full merits proceedings addressed essentially the same issues. At the very least, none of these cases involve an appellate court expressly upholding the basis of the injunction while nonetheless deciding for the enjoined party on other grounds. So while these cases properly articulate the standard, their application of that standard offers little guidance in this situation.

That is because here, no court at any point "found" the NJTHA "to have been wrongfully enjoined or restrained." Fed.

3

R. Civ. P. 65(c). Quite the contrary, in fact. As the procedural history shows, the District Court issued the TRO based on its conclusion that the 2014 law violated PASPA. *Christie II*, 61 F. Supp. 3d 488, 491 (D.N.J. 2014). We affirmed, holding that the 2014 law violated PASPA by authorizing gambling. *Christie II*, 832 F.3d 389, 397 (3d Cir. 2016) (en banc). And the Supreme Court agreed that New Jersey's repealer law was actually an authorization. *Murphy*, 138 S. Ct. 1461, 1474 (2018).[1] In sum, every court to have considered the issue of whether the 2014 law was actually an authorization—the very ground for the TRO—agreed with the District Court.[2]

Given the unanimity on this statutory point, the NJTHA must rely on a far-reaching view of retroactivity to support its claim that it was wrongfully enjoined. The majority purports to sidestep this point, asserting without any explanation that retroactivity is not implicated in this analysis at all. In its view, Rule 65 presents "a simpler inquiry" that asks "whether, if we knew then what we know now, should NJTHA have been restrained?" Maj. Op. 19. But that begs the question by simply assuming that the Supreme Court's 2018 decision on the

---

[1] The majority correctly reads the Supreme Court's decision to have "agreed with one aspect" of our decision—"namely, that a repeal of a law banning an activity constitutes an 'authoriz[ation]' of that activity." Maj. Op. 9.

[2] To be sure, the NJTHA's failure to re-litigate PASPA's constitutionality in *Christie II* was hardly improper. Our decision in *Christie I* made that constitutional issue res judicata. As the NJTHA acknowledges, any follow-on constitutional challenge would have "been an exercise in futility," since a "lower court has no power to overrule the precedent of its judicial superior." NJTHA Br. 28.

In spite of that acknowledgment, the majority views *Christie I*'s constitutional question and *Christie II*'s statutory question as forming the same "ball of wax." Maj. Op. 14. But the fact that the Supreme Court reached more broadly to decide the constitutional question does not mean that the statutory and constitutional questions were intertwined *for purposes of the TRO*. That TRO issue was much narrower. While the Supreme Court had wide discretion to review the commandeering question, on which it passed in *Christie I*, that issue was not before the District Court in *Christie II*.

commandeering issue means that PASPA never existed—in other words, the statute was void *ab initio*. That questionable assumption is the only way to explain the majority's assertion that the NJTHA had the right "all along" to conduct sports gambling. Maj. Op. 13. But the Supreme Court has long cautioned against stretching this concept too far. *See Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374 (1940) ("The actual existence of a statute, prior to [a determination of unconstitutionality], is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.").[3] The majority thus commits the "writ-of-erasure fallacy," or the mistaken "assumption that a judicial pronouncement of unconstitutionality has canceled or blotted out a duly enacted statute" and rendered it a nullity. Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 937 (2018).

Such an expansive view of retroactivity in this context is out of step with Rule 65's function. The rule's bond requirement "is rooted in the belief that a defendant deserves protection against a court order granted without the full deliberation a trial offers." *Am. Bible Soc. v. Blount*, 446 F.2d 588, 595 n.12 (3d Cir. 1971). In other words, the bond protects the enjoined party "if it turns out that the order issued was erroneous in the sense that it would not have been issued if there had been the opportunity for full deliberation." *Id*. Here, of course, the District Court engaged in just that full deliberation following the TRO, satisfying Rule 65.

That full deliberation separates this case from the usual instances of a party being found to have been wrongfully enjoined. Typically, this finding occurs after the trial court's

---

[3] *See also United States v. Baucum*, 80 F.3d 539, 541 (D.C. Cir. 1996) (per curiam) (denying argument "premised on the theory that if an Act of Congress is unconstitutional, it is void *ab initio*, and any action taken pursuant to it is thus invalid," noting that the Supreme Court "has rejected such a broad-sweeping proposition"); *cf. State of Kan. ex rel. Stephan v. Adams*, 705 F.2d 1267, 1270 (10th Cir. 1983) (explaining that "the TRO was not dissolved because it was wrongfully issued, but rather because of an intervening event," noting that it was "the intervention of Congress that brought about the change").

merits adjudication following the temporary injunction.[4] The finding may also be made by an appellate court reversing a temporary injunction. *See Div. No. 1, Detroit, Bhd. of Locomotive Engineers v. Consol. Rail Corp.*, 844 F.2d 1218, 1225 (6th Cir. 1988) (collecting cases). But the majority has not cited any case in which an appellate decision like *Murphy*—agreeing with the basis for the injunction while invalidating the law on other grounds—has supported a finding that a party was wrongfully enjoined.

\* \* \* \* \*

In sum, I see little support for holding that a party was wrongfully enjoined when the District Court faithfully followed our precedent—as we and the Supreme Court acknowledged even as the Supreme Court invalidated the underlying law on different grounds. Had the District Court based the TRO on the constitutional question ultimately decided by the Supreme Court, I would view this matter differently. But that is not what happened here. And without an actual finding that a party was wrongfully enjoined, Rule 65 is not satisfied. Because the majority holds otherwise, I respectfully dissent.

---

[4] *See, e.g., Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.,* 335 F.3d 235, 242 n.9 (3d Cir. 2003) ("But the ultimate determination whether a party was wrongfully enjoined and can recover on the injunction bond generally must wait until 'after a trial and final judgment on the merits.' (quoting *Clark v. K–Mart Corp.*, 979 F.2d 965, 969 (3d Cir. 1992) (en banc)); *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc*., 775 F.3d 128, 139 (2d Cir. 2014) ("That a trial on the merits is usually required to determine whether the defendant was entitled to engage in the conduct that was enjoined is true irrespective of whether the defendant seeks recovery on security posted to secure a TRO or a preliminary injunction.").